# COMMONWEALTH vs. MARITIME UNDERWATER SURVEYS, INC.

Barnstable. September 15, 1988. — December 12, 1988.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Admiralty. Vessel*, Wreck. *Commonwealth*, Maritime boundary. *Jurisdiction*, Submerged lands.

A certain wrecked vessel and its cargo, that had rested undisturbed and undiscovered beneath the sea for nearly three centuries, were properly considered abandoned and therefore subject to the admiralty principle of "finds," which, absent a legislative exercise of the sovereign prerogative, gives title to the first party to discover the property and reduce it to possession. [504-506]

Under the Federal Submerged Lands Act of 1953, 43 U.S.C. §§ 1311 et seq. (1982), the United States retained paramount rights and sovereignty over submerged lands within the boundaries of coastal States; the act, moreover, contemplated no transfer to the coastal States of any rights in underwater archaeological treasures and artifacts. [506-508]

Where the United States had paramount rights and sovereignty over the submerged land upon which a certain wrecked and abandoned vessel rested, and had not transferred to the Commonwealth any rights in the vessel or its cargo, G. L. c. 91, § 63, a statutory scheme for the regulation of salvaging activities that presupposes the Commonwealth's ownership of the resources to be salvaged, was inapplicable to the salvage operations of the finder to whom admiralty principles gave title to the vessel. [508-509]

CIVIL ACTION commenced in the Superior Court Department on December 13, 1982.

The case was heard by *James J. Nixon*, J., on motions for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Carolyn V. Wood*, Assistant Attorney General, for the Commonwealth.

*Allan H. Tufankjian (James P. McMahon* with him) for the defendant.

LYNCH, J.  History, legend, and the evolution of our legal and governmental systems converge in this tale of shipwreck and sunken treasure which begins in the early Eighteenth Century. In April, 1717, the notorious pirate ship "Whydah," laden with plundered cargo, crashed and capsized in a raging storm off the Cape Cod coast, disappearing beneath the sea, and evading discovery and salvage for the next two hundred sixty-five years. While all but two sailors perished in the wreck, the Whydah's legend survived, and the remains of the vessel were apparently located in 1982 after extensive research and searching.[1] Giving spectral significance to the observation of Roger Byam, the narrator of "Mutiny on the Bounty," that a ship seems "at times to have the very breath of life," the ill-fated Whydah, nearly three centuries later, has sailed into this court's jurisdiction as the subject of a dispute between contemporary treasure seekers and the would-be modern sovereign of the coastal waters — a conflict mired in competing claims of title to the shipwreck and its cargo, involving issues of Federal maritime and admiralty law, and disputed dominion over submerged lands in the marginal sea.[2]

The parties submitted a statement of agreed facts. In November, 1982, Maritime Underwater Surveys, Inc. (Maritime), discovered an unidentified, wrecked, and abandoned vessel one mile off the coast of Wellfleet under approximately fourteen feet of water and five feet of sand within the coastal waters of Massachusetts. The Commonwealth was neither actively searching for nor aware of the location of the wreck. Shortly after its discovery, Maritime filed an in rem admiralty action in the United States District Court for the District of Massachusetts, seeking title to the abandoned vessel, or the grant of a salvage award. The District Court issued a

---

[1] Maritime Underwater Surveys, Inc., claims the wreck it discovered is the Whydah. The Commonwealth does not dispute that contention.

[2] An historical account of the infamous blackguard, Captain Samuel Bellamy, who captured the Whydah and steered the ship into a course of pillaging and plundering, is ably and dramatically told in the opening section of the Superior Court judge's memorandum of decision, reproduced in the Appendix to this opinion.

warrant for arrest in rem, and appointed Maritime substitute custodian of the vessel. The United States Marshal executed the warrant. The Commonwealth contested Maritime's claim of ownership to the vessel through the filing of a restricted appearance, asserting that, since the Commonwealth itself claimed title and no other parties had appeared to contest Maritime's claim, the Federal court therefore lacked jurisdiction under the Eleventh Amendment to the United States Constitution to adjudicate what was essentially a suit against the State. The District Court agreed, dismissed the action on jurisdictional grounds, and was subsequently upheld on appeal. *Maritime Underwater Surveys, Inc.* v. *Unidentified, Wrecked and Abandoned Sailing Vessel,* 717 F.2d 6 (1st Cir. 1983).

The Commonwealth simultaneously instituted an action in Superior Court seeking a confirmation of its title in the vessel and cargo, and a declaration that Maritime was obliged to comply with the Commonwealth's statutory scheme requiring a permit for exploration, recovery, or salvage of underwater archaeological resources. G. L. c. 91, § 63 (1986 ed.). The Superior Court judge entered an order of custody, assented to by the Commonwealth, appointing Maritime temporary custodian of the wreck. Under protest, and reserving its right to contest the applicability of the statute, Maritime applied to the Board of Underwater Archaeological Resources (board) for a permit to salvage the vessel pursuant to c. 91, § 63. Maritime began excavation and salvage operations under a subsequently-issued permit to explore and salvage within a limited area, and since 1983 has successfully recovered numerous artifacts. Maritime also applied for, and was granted, a permit from the Army Corps of Engineers, allowing it to perform certain excavation procedures as long as it abided by "strict historic and archaeological standards." Pursuant to 16 U.S.C. § 470f (1982), the permit was issued after consultation with the Federal Advisory Council on Historic Preservation and the State Historic Preservation Officer.

Believing that wreckage or cargo, known as "scatter," from the Whydah might have settled beyond the limited area delineated in its State permit, Maritime requested, but was denied,

an extension of the search area. The board's regulations provide for permits to explore and salvage *areas* rather than wrecks, and limit the number of permits which can be granted to a single permittee to a total of one excavation and one reconnaissance permit. See 312 Code Mass. Regs. § 2.08 (2) (1986). Third parties had applied for, and received, permits to explore and excavate adjacent areas which Maritime believed to contain scatter from the Whydah.[3] Maritime therefore sought, and in February, 1986, obtained, a preliminary injunction, restraining the Commonwealth from granting or extending any additional permits for sites within one mile of Maritime's permit area. The parties thereafter filed cross motions for summary judgment regarding title to the vessel and the applicability of G. L. c. 91, § 63. The judge denied the Commonwealth's motion, and, in granting Maritime's motion, declared that title to the vessel is vested in Maritime and that, since G. L. c. 91, § 63, conflicts with Federal maritime law, Maritime is not obliged to comply with the statute's requirements. The Commonwealth appealed from this judgment, and we transferred the case here on our own motion. Since the Superior Court judge's decision rests on a statement of agreed facts and governing principles of law, we may draw our own inferences and decide the case according to our judgment as to the questions of law. *Newburyport Soc'y for the Relief of Aged Women* v. *Noyes*, 287 Mass. 530, 532-533 (1934). See *Simon* v. *Weymouth Agricultural & Indus. Soc'y*, 389 Mass. 146, 148-149 (1983).

The conflicting assertions of title to the Whydah rest on two complementary principles of admiralty law. Maritime claims title to the vessel under the law of finds, or, alternatively, an award for recovery of the wreck under the law of salvage. The Commonwealth claims ownership of the Whydah through the legislative assertion of title in G. L. c. 6, § 180 (1986 ed.), to all underwater archaeological resources,[4] contending that the statute evinces the Commonwealth's exercise of sovereign prerogative, and that any salvage operations and award must

---

[3] One of these, Old Blue Fishing Co., Inc., was allowed to intervene.

[4] The parties agree that the Whydah meets the statutory definition of an underwater archaeological resource.

be governed by the statutory scheme and board regulations requiring a permit.

The law of salvage is an ancient maritime doctrine which, unlike traditional common law, was meant to encourage the rescue of imperiled or derelict marine property by providing a liberal reward to those who recover property on or in navigable waters. See 3A M. J. Norris, Benedict on Admiralty, § 1 (7th ed. 1983 & Supp. 1986). "Compensation as salvage is not viewed by the admiralty courts merely as pay . . . but as a reward given for perilous services . . . and as an inducement . . . . Public policy encourages the hardy and adventurous mariner to engage in these laborious and sometimes dangerous enterprises." *The Blackwall*, 77 U.S. (10 Wall.) 1, 14 (1869). This doctrine assumes that the property is owned and has not been abandoned. The law of finds, on the other hand, grants title to the first party to discover and reduce to possession things found in the sea which have never been owned or property which is long-lost or abandoned. Benedict on Admiralty, *supra* at § 158. The application of admiralty law to a claim regarding derelict property, "[u]nder usual circumstances . . . would lead to an award *either* of outright ownership of the recovered goods (applying the law of finds) *or* of entitlement to an appropriate salvage award" (emphasis added). *Cobb Coin Co.* v. *Unidentified, Wrecked & Abandoned Sailing Vessel*, 525 F. Supp 186, 198 (S.D.Fla. 1981). See *Treasure Salvors, Inc.* v. *Unidentified, Wrecked & Abandoned Sailing Vessel*, 640 F.2d 560, 567 (5th Cir. 1981) (*Treasure Salvors III*); *Rickard* v. *Pringle*, 293 F. Supp. 981, 984 (E.D.N.Y. 1968) (since ship's propeller had lain abandoned on ocean floor for sixty years, ownership vested by operation of law in first finder lawfully reducing it to possession). American courts have applied the law of finds, rather than the law of salvage, in cases involving ancient shipwrecks where no owner is likely to come forward. See, e.g., *Treasure Salvors, Inc.* v. *Unidentified, Wrecked & Abandoned Sailing Vessel*, 569 F.2d 330, 336-337 (5th Cir. 1978) (*Treasure Salvors I*); *Wiggins* v. *1100 Tons, More or Less, of Italian Marble*, 186 F. Supp. 452, 456 (E.D.Va. 1960). Cf. *Hener* v. *United States*, 525 F. Supp.

350, 355, 358 (1981) (despite preference for law of salvage, court may properly apply law of finds where all parties assume property has been abandoned and no prior owner is likely to appear). The English common law approach to the law of finds is that title to abandoned property found on the seas is the prerogative of the crown. *Treasure Salvors I, supra* at 340-341. The so-called American Rule is that title to recovered property or treasure rests in the finder absent a legislative exercise of the sovereign prerogative. *Id.* at 341-343.

We conclude that, since the Whydah has rested undisturbed and undiscovered beneath the sea for nearly three centuries, it is proper to consider the wreck abandoned and accordingly to apply the law of finds. *Martha's Vineyard Scuba Headquarters, Inc.* v. *Unidentified, Wrecked and Abandoned Steam Vessel,* 833 F.2d 1059, 1065 (1st Cir. 1987) ("given the passage of so many decades after the sinking," District Court did not err in applying law of finds). Title to the wreck therefore vests in Maritime unless the sovereign prerogative has been exercised. The Commonwealth claims that G. L. c. 6, § 180, is its assertion of sovereign prerogative, and that the Whydah was therefore owned by the Commonwealth and *not* abandoned at the time of Maritime's discovery of the wreck. Maritime contends that the United States, and not the Commonwealth, is sovereign of the submerged lands along the coast, and that c. 6, § 180, is therefore ineffective as a legislative assertion of title or sovereign prerogative. A threshold question, therefore, and one correctly decided by the Superior Court judge, concerns whether the Federal government or the Commonwealth is the sovereign.

The Commonwealth's claim of sovereignty rests in part on the State's Marine Boundaries Act, G. L. c. 1, § 3 (1986 ed.), which declares that the territorial limits of the Commonwealth "shall extend seaward to the outer limits of the territorial sea of the United States," and on c. 1, § 2, which declares that "the sovereignty and jurisdiction of the Commonwealth shall extend to all places within its boundaries." The question whether the United States government has paramount rights in the submerged lands beneath navigable waters within the bound-

aries of the coastal States was considered by the United States Supreme Court in a controversial 1947 case in which the Court held that notwithstanding the State's ability to exercise its police power over the three-mile marginal belt within its boundaries, the Federal government had "paramount rights in and power over this area." *United States* v. *California*, 332 U.S. 19, 36 (1947). This decision arose out of an attempt by the Federal government to enjoin California from executing leases for the drilling for petroleum and mining of other natural resources in the offshore seabed. The conclusion that States had no interest in the oil or mineral deposits along the coast resulted in passage of the Submerged Lands Act of 1953, 43 U.S.C. §§ 1311 et seq. (1982) (Act), which vested in the States title to the lands and natural resources under the navigable waters extending three miles from their respective coastlines. *United States* v. *Alaska*, 422 U.S. 184, 187 (1975).

The Commonwealth contends that its Marine Boundaries Act, G. L. c. 1, § 3, is consistent with the Federal Submerged Lands Act, and that it accordingly has complete dominion and sovereignty over the land in which the Whydah now lies. Maritime argued, and the Superior Court judge agreed, that the Submerged Lands Act was intended only to transfer title to and concomitant development rights in natural resources, without disturbing the sovereignty of the Federal government over the marginal sea. We agree. "The Act left congressional power over commerce and the dominant navigational servitude of the United States precisely where it found them." *United States* v. *Rands*, 389 U.S. 121, 127 (1967). See *Cobb Coin Co., Inc.* v. *Unidentified, Wrecked & Abandoned Sailing Vessel*, 525 F. Supp. 186, 215-216 (S.D.Fla. 1981) (the Act "does not empower the State, through legislation which purports to derogate both federal jurisdiction and the application of admiralty principles, to lay claim to abandoned wreck sites"). The Act itself explicitly cautions that nothing therein should "be construed as the release or relinquishment of any rights of the United States arising under the constitutional authority of Congress to regulate or improve navigation," 43 U.S.C. § 1311(d) (1982), and expressly retains for the United States "all its

navigational servitude and rights in and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce, navigation, national defense, and international affairs." *Id.* at § 1314(a). These rights and powers "shall be paramount to, but shall not be deemed to include, proprietary rights of ownership . . . use and development of the lands and natural resources." *Id.* In 1975, the Supreme Court expressly declined to overrule the *California* decision which had led to passage of the Act, stating that its "constitutional underpinnings" and rule "that paramount rights to the offshore seabed inhere in the Federal Government" as an incident of Federal sovereignty, were "embraced rather than repudiated by Congress" through passage of the Act. *United States* v. *Maine,* 420 U.S. 515, 524 (1975).

That the Federal government granted ownership rights only, while retaining paramount sovereignty, and that the Act did not contemplate a transfer of rights in underwater archeological treasures or artifacts, is evidenced in the Abandoned Shipwreck Act of 1987 (enacted in April, 1988), in which title to any abandoned shipwreck embedded in the submerged lands of any State is asserted by the United States, 43 U.S.C. § 2105(a) (Pub. L. No. 100-298, 102 Stat. § 432 [1988]), and "transferred to the State in or on whose submerged lands the shipwreck is located." *Id.* at § 2105(c). The Abandoned Shipwreck Act also expressly provides that neither the law of salvage nor the law of finds shall apply to any shipwreck to which its provisions apply. *Id.* at § 2106(a). While the Abandoned Shipwreck Act by its terms does not affect any legal proceeding brought prior to the law's enactment, § 2106(c), its provisions are consistent with the view that title to or rights in ancient wrecks were *not* conveyed in the Submerged Lands Act and that the constitutional power to take control of and assert title to abandoned wrecks remained in the Federal government after passage of the Act.

Since we have concluded that the Commonwealth is *not* the sovereign, and that its assertion of sovereign prerogative is therefore ineffective, and since we decide that the Federal maritime law of finds applies and title to the wreck consequently

vests in Maritime, Maritime is not subject to the Commonwealth's statutory scheme (G. L. c. 91, § 63), in its salvaging of the wreck. We need not decide whether the Commonwealth's statutory scheme requiring licensing of salvage projects impermissibly intrudes upon or violates Federal admiralty law, because the salvage statute, which presupposes the Commonwealth's ownership of the resources to be salvaged, is wholly inapplicable in this case. Rather, under Federal admiralty law regarding abandoned maritime property, the first successful finder or salvor has "possession of the distressed property with which no one can interfere." *Rickard* v. *Pringle*, 293 F. Supp. 981, 985 (E.D.N.Y. 1968). See *Treasure Salvors III, supra* at 567. The judge was therefore correct in declaring that Maritime is not obliged to comply with G. L. c. 91, § 63, and that it has the right to exclude other salvors from recovering the remains of the Whydah or its treasure. Thus, the claim of the Commonwealth founders on the shoals of Federal sovereignty as surely as the Whydah foundered on the shoals off Wellfleet, ironically suffering the same fate as the 1717 proclamation of the Colony's Royal Governor Samuel Shute, which claimed the wreck for the Crown.

*Judgment affirmed.*

APPENDIX.

"*Historical Background*

"In April, 1717, the great pirate ship 'Whydah', loaded with gold, indigo and other purloined treasure, crashed hard against a sand bar amid a tempest off the coast of Cape Cod. The ship capsized almost at once, and within minutes all of its crewmembers were struggling in the raging sea. One hundred and forty four men perished (only two survived), including the captain of the craft, the infamous Samuel Bellamy, 'as notorious a pirate as ever sailed the Spanish main.' Edward R. Snow, *Great Storms and Famous Shipwrecks of the New England Coast*, 51 (1946). As the great ship went down, its great plundered cargo also was swallowed up by the violent sea.

"The story of Bellamy and his ill-fated capture of the 'Whydah' has been often told. In 1716, Bellamy ventured to the West Indies in hopes of

salvaging a sunken vessel. Frustrated by the complete failure of this 'legiti-mate' endeavor, Bellamy and another disappointed salvor, Paulsgrave Wil-liams, decided to become pirates or, in the lexicon of the trade, to 'go on the account.' George F. Dow, *Pirates of the New England Coast*, 116 (1923). They joined with two other ambitious marauders, Benjamin Horngold and Louis Lebous, and, with a crew of 140 men, set off to pillage the seas.

"In the months ahead, Bellamy captured several vessels off the Virgin Islands and St. Croix. One such ship, the 'Sultana', was made into a galley, the command of which was given to Paulsgrave Williams. From another ship, the 'St. Michael,' the pirates forced four men to join their crew. Among them was Thomas Davis, who turned out to be 'the only white man to escape drowning when Bellamy was afterwards wrecked on Cape Cod.' Dow, *Pirates of the New England Coast* at 116.

"Bellamy first spotted the 'Whydah' sailing through the Windward Pass-age between 'Porto Rico' and Cuba in late February, 1717. A London galley fresh from a successful slaving voyage, the 'Whydah' was loaded with a rich cargo of indigo, Jesuit's bark, elephant's teeth, gold dust, sugar and other valuables. Bellamy pursued the 'Whydah' for three days before finally sailing close enough to fire a shot at the galley. To Bellamy's amazement, the single shot ended the chase, and Captain Lawrence Prince quickly lowered the ship's flag in surrender. As a reward for his lack of resistance, Captain Prince was given the 'Sultana', and Bellamy, now pilot-ing the 'Whydah,' led his crew toward the Capes of Virginia, plundering more ships along the way.

"About this time a great storm struck, blowing with such violence that the 'Whydah' nearly capsized. At Bellamy's skillful command, the ship survived the four-day gale, but this near-disaster proved a harbinger of what awaited the crew on the hard sandbars of Cape Cod.

"When this storm finally abated, Bellamy changed course and headed toward Rhode Island. On the way he overtook a sloop commanded by Captain Beer, who was ordered on board the 'Whydah' while his sloop was being plundered. Both Bellamy and Williams wanted to give Captain Beer his sloop again, but were outvoted by the rest of the crew and the sloop [was] sunk. After the vote was taken, Bellamy made the following now-famous speech to Captain Beer:

> Damn my blood. I am sorry they won't let you have your Sloop again, for I scorn to do any one a Mischief, when it is not for my advantage; damn the Sloop, we must sink her, and she might be of Use to you. Tho,' damn ye, you are a sneaking Puppy, and so are all those who will submit to be governed by laws which Rich Men have made for their own Security, for the cowardly Whelps have not the Courage otherwise to defend what they get by their knavery; but damn ye altogether: Damn them for a Pack of crafty

Rascals, and you, who serve them for a Parcel of henhearted Numskuls. They villify us, the soundrels do, when there is only this difference, they rob the Poor under the Cover of Law, forsooth, and we plunder the Rich under the Protection of our own Courage
. . . .

Dow, *Pirates of the New England Coast* at 121, quoting Johnson's *History of the Pirates* (1727).

"Bellamy made one more noteworthy capture before disaster struck. On April 26, 1717, he took the pink 'Mary Anne' of Dublin, laden with a cargo of wine from Madeira. Seven pirates were sent upon the captured vessel, while the pink's captain, Andrew Crumpstey, and five of his hands were ordered upon the 'Whydah.' At this point Bellamy, now commanding a four-ship fleet, resumed his course northward, allowing the 'Mary Anne' to lead the way.

"Just what stroke of fate led the fleet into the rough waters of Cape Cod is not entirely clear. It appears that the pirates on the pink imbibed heavily of the wine on board, which may have led to some sloppy navigating. By one account, largely discredited today, Captain Crumpstey was permitted to pioneer the lead ship and intentionally led the fleet into dangerous waters, unbeknownst to the intoxicated pirates on board.

"What is clear is that by the evening of April 26 the pirates had come upon another raging storm. 'The wind blew from the east, it lightened and rained hard and the vessels soon lost sight of each other.' Dow, *Pirates of the New England Coast* at 123. The 'Mary Anne' was tossed against heavy breakers, then ran ashore on the south side of Cape Cod in what is now the town of Orleans. At daybreak, those aboard the pink managed to jump directly off the boat onto land. The pirates on board made great haste toward Rhode Island. News of the wreck soon reached Joseph Doane of Eastham, a justice of the peace who, with a deputy sheriff and posse of men, pursued the fleeing pirates, and captured them at the Eastham tavern.

"Meanwhile, the 'Whydah' strayed into turbulent waters ten miles north of where the 'Mary Anne' ran aground. An anchor was dropped, but the force of the sea was so great that 'the cable was cut and the attempt made to work off shore but she soon drove on the bar. A quarter of an hour after she struck, the mainmast went by the board and in the morning the fine new ship was a tangled mass of wreckage.' Dow, *Pirates of the New England Coast* at 125. Her entire contents, crewmen and cargo alike, spilled like pebbles into the sea. Only two men, Davis, who had been forced aboard in December, and John Julian, a Cape Cod-born Indian, managed to swim to safety.

"By the next morning, the remains of the ship washed ashore, and Davis, Julian and some twenty others salvaged the few valuables that had washed up. The next day Davis and Julian were arrested for piracy and placed with the seven pirates from the 'Mary Anne' in the Barnstable jail.

"Meanwhile, Royal Governor Samuel Shute, upon learning of the wrecked vessel, issued a proclamation taking possession of everything of value from the wreck on behalf of the crown, and dispatched his 'most trusted mariner, Captain Cyprian Southack, to the scene of the disaster.' Snow, *Great Storms and Famous Shipwrecks* at 54. The colorful Captain Southack was just the man for the job, for he had produced a map of the Boston shoreline before 1700, and knew more about the treacherous Massachusetts coastline than any other mariner of his generation.

"Nonetheless, Southack's mission proved a dismal failure. By the time he arrived at the wreck site, local residents had picked the shoreline clean of valuables. And most residents defied Governor Shute's order to turn over all such goods to Captain Southack. '. . . His Majesty's "loving subjects" refused to disgorge. "They are very wise and will not tell one nothing of what they got on the Rack" wrote the complaining captain.' Dow, *Pirates of the New England Coast* at 128.

"The local residents' displeasure with Captain Southack deepened when mangled bodies began to wash ashore from the wreck. The local coroner ordered that the bodies be buried and demanded that Captain Southack pay the costs of interment. Utterly discouraged both by his failure to find any treasure and by the uncooperativeness of the local inhabitants, Captain Southack loaded what goods he could find aboard the sloop 'Swan' heading for Boston. As fate would have it, the 'Swan' was plundered by pirates.

"The following October, the nine jailed pirates were brought to trial in Boston. All were condemned to death except Davis and Thomas South, who were freed. Julian later died in jail, but the remaining six were hanged before a 'large and fascinated crowd' at Charlestown Ferry on November 15, 1717. Snow, *Great Storms and Famous Shipwrecks* at 56.

"The vast riches on board the 'Whydah', which, Davis testified, 'were laid together in one head,' Dow, *Pirates of the New England Coast* at 125, were never retrieved. Nor were they ever forgotten. John Newcomb, a Wellfleet oysterman, once told Henry David Thoreau that he had seen the 'iron caboose' of the Whydah 'during an extremely low run of tides.' Snow, *Great Storms and Famous Shipwrecks* at 56. Around 1863, according to one historian, the wreck was exposed again, but still eluded salvage. During the middle of the last century, Thoreau and a companion found a few coins on the bar near the wrecksite.

"But the first major breakthrough in uncovering the great treasure of the 'Whydah' came in 1982, when the defendant in this case, Maritime Underwater Surveys (Maritime), reported discovery of the vessel about a mile off the beach of Wellfleet, in approximately fourteen feet of water and under approximately five feet of sand. Maritime has since undertaken excavation efforts, uncovering numerous artifacts, including a ship's bell bearing the inscription 'THE *WHYDAH* *GALLEY* 1716.'

"It should be noted that the luckless Captain Southack, though he failed miserably in his own efforts to secure the treasure, aided significantly in Maritime's successful search efforts by accurately mapping the site of the wreck."