## MASSACHUSETTS BAY LINES, INC. *vs.* COMMISSIONER OF REVENUE.

No. 07-P-1524.

Suffolk. May 13, 2008. - August 5, 2008.

Present: KANTROWITZ, KAFKER, & VUONO, JJ.

*Taxation,* Appellate Tax Board: appeal to Appeals Court; Abatement.

Discussion of the convention center financing act, St. 1997, c. 152, § 9, as amended by St. 1999, c. 68, § 17, and the surcharges it created. [324-325]

Discussion of the standard of review applicable to decisions of the Appellate Tax Board. [325-326]

The Appellate Tax Board (board) properly affirmed the Commissioner of Revenue's decision to deny the taxpayer's request for an abatement of surcharges on its whale watch cruise operations, where there was substantial evidence to support the board's conclusion that such cruises, which commenced in Boston Harbor, met the requirement of being conducted partly in Boston [326-327], and qualified as sightseeing or entertainment cruises under the convention center financing surcharge act, St. 1997, c. 152, § 9, as amended by St. 1999, c. 68, § 17 [327-328].

The Appellate Tax Board (board) properly affirmed the Commissioner of Revenue's decision to deny the taxpayer's request for an abatement of surcharges on its water-based private charters, undertaken by captains and crews, provided by the taxpayer, who retained ultimate control of the taxpayer's vessels during the charters, where such operations did not come within the exception for "bare-boat" charters in the convention center financing surcharge act, St. 1997, c. 152, § 9, as amended by St. 1999, c. 68, § 17 (act) [328-329], and where the revenues for the taxpayer's private charters derived from "tickets" within the act's definition of that term [329-330].

APPEAL from a decision of the Appellate Tax Board.

*David J. Nagle* (*William E. Halmkin* with him) for the taxpayer.

*Christine A. Baily,* Assistant Attorney General, for the Commissioner of Revenue.

KAFKER, J. The Legislature provided in an act relative to the construction and financing of convention and exhibition centers in the Commonwealth that any "water-based sightseeing . . .

or entertainment cruise or tour . . . originating . . . in the commonwealth and conducted partly or entirely within the city of Boston" shall be surcharged five percent "on the price of any ticket purchased for" such cruise or tour (convention center financing or CCF surcharge). St. 1997, c. 152, § 9(*d*), as amended by St. 1999, c. 68, § 17. The taxpayer, Massachusetts Bay Lines (Mass. Bay), provided a variety of water-based tours and cruises leaving from Rowes Wharf in Boston Harbor. At issue is whether the CCF surcharge applied to Mass. Bay's whale-watching or private charter operations. The Appellate Tax Board (board) determined that both whale watches and private charters met the statutory requirements for a CCF surcharge. We agree and affirm the board's decision.

1. *Background.* The following facts were found by the board. Mass. Bay is a Massachusetts corporation with a principal business address at 60 Rowes Wharf in Boston. It operated seven vessels in various capacities. Mass. Bay paid CCF surcharges due on receipts from its sunset, moonlight, music, Fourth of July fireworks, USS Constitution, and historic harbor cruises, but did not pay the CCF surcharges on its receipts from whale watch cruises or private charters.

The whale watch cruises at issue left from Rowes Wharf, and tickets were sold to the general public in the same manner that they were sold for the Mass. Bay cruises admittedly subject to the surcharge. The whale watch cruises were advertised as "four-hour or five-hour trips for whale-watching," "Boston's #1 Sightseeing Experience," and "Boston's Most Popular 4-Hour Tour." Both the Web site and the brochure promised that "[i]f you do not see a whale, we will give you a FREE ticket to enjoy your adventure again."

Passengers who boarded the vessels for whale watch cruises first encountered a naturalist, who gave a safety announcement and then played a video presentation about the behavior and habitat of whales. While in the harbor, the naturalist sometimes pointed out Boston landmarks, including Logan Airport and Castle Island, but did not explain or provide information about the landmarks. After leaving Boston Harbor, the vessels proceeded to Stellwagen Bank National Marine Sanctuary (Stellwagen Bank), the western boundary of which is approximately twenty-five

miles east of the Boston coastline.[1] The board found that there was "no evidence in the record that passengers saw whales only upon arrival at Stellwagen Bank, rather than en route." There was, however, evidence that Stellwagen Bank is an extraordinary whale habitat.[2]

Mass. Bay's private charters were used for corporate events, weddings, parties, and burials or memorials at sea. Any private individual or corporation could set up a private charter, or serve as a "charterer," with Mass. Bay. Individual tickets were not sold for private charters by Mass. Bay. Instead, the charterer contracted with Mass. Bay, then produced and collected tickets for the cruise if he or she so chose. The captain and crew were provided by Mass. Bay, and the charterer determined the date, time, duration of the cruise, the route of the vessel, and the locations of departure and arrival of the vessel. The captain, a Mass. Bay employee, "had ultimate control of the vessel." The captain was responsible for the safety of the vessel, the crew, and the passengers, and for ensuring that the vessel was in adherence with Federal and State laws. While Mass. Bay advertised that charter boats were "the ultimate venue for dance, band, and all entertainment cruises" and "the ultimate venue for your entertainment needs," the charterer was solely responsible for entertainment activities during the cruise, and Mass. Bay did not provide entertainment.

The Commissioner of Revenue (commissioner) sent Mass. Bay a notice of intent to assess additional CCF surcharges on February 24, 2003. The commissioner found that $154,412.77 in CCF surcharges had not been paid for whale watch cruises and private charters for the 2000-2002 taxable periods.[3] On March 28, 2003, Mass. Bay requested a preassessment hearing for all the periods at issue and a preassessment conference was held on May 5,

[1]As provided in G. L. c. 42, § 1, however, the "seaward boundary of cities and towns bordering on the open sea shall coincide with the marine boundary of the commonwealth." The marine boundary of the Commonwealth extends three geographical miles from shore. See 43 U.S.C. § 1312 (2000). See also *Commonwealth* v. *Maritime Underwater Surveys, Inc.*, 403 Mass. 501, 506-507 (1988).

[2]A longtime Mass. Bay captain also testified that he had never seen a whale in Boston Harbor.

[3]The parties stipulated that $41,942.22 was at issue regarding whale watch cruises and $112,470.55 for private charters, for a total of $154,412.77.

2003. The commissioner notified Mass. Bay that he had assessed additional CCF surcharges and interest for all periods at issue on November 29, 2003.[4] Mass. Bay filed an application for abatement on January 12, 2004, which was denied by the commissioner on February 20, 2004. Mass. Bay filed a petition with the board on April 16, 2004, appealing the commissioner's refusal to abate the CCF surcharges.

Mass. Bay generally contended to the board that neither the whale watch cruises nor the charters were subject to the CCF surcharge. The board disagreed and affirmed the commissioner's decision to deny Mass. Bay's request for an abatement. In doing so, the board concluded that Mass. Bay's whale watch cruises were partly conducted within Boston Harbor, and that they were sightseeing or entertainment cruises within the meaning of St. 1997, c. 152, § 9, as amended by St. 1999, c. 68, § 17 (CCF Act). In addition, the board found that the payment that Mass. Bay received from persons who arranged for private charters constituted a "ticket" within the meaning of the CCF Act, as the definition of ticket included a "group admission charge." Mass. Bay timely appealed.

2. *Discussion.* a. *CCF legislation.* The Legislature enacted the CCF Act in 1997 and amended it in 1999 to finance the construction of the convention and exhibition centers in the Commonwealth. Under the CCF Act, substantial revenue was to be raised by a 2.75 percent increase in the hotel room occupancy tax in Boston, Cambridge, Springfield, and Worcester. St. 1997, c. 152, § 9(*a*). The CCF Act also created other tourist industry surcharges, including § 9(*d*), which states:

> "There shall be a surcharge of 5 per cent of the purchase price imposed on the price of any ticket purchased for any water-based sightseeing, tourist venue or entertainment cruise or tour and for any land-based sightseeing, tourist venue or trolley tour, originating or located in the commonwealth and conducted partly or entirely within the city of Boston [with exceptions for children's tickets $6 or less and school or youth groups]. For purposes of this paragraph, a ticket shall include any individual or group admission

---

[4]The notice of assessment dated November 29, 2003, assessed interest of $29,092.05, for a total assessment of $183,504.82.

charge for said tour or cruise, whether or not evidenced by a written agreement, and a water-based entertainment cruise shall include any cruise of 24 hours duration or less, conducted partly or entirely within the city of Boston, whose primary purpose is not transportation, but shall not include bare-boat charters so-called."

St. 1997, c. 152, § 9(*d*), as amended by St. 1999, c. 68, § 17. On January 28, 2000, the commissioner issued Technical Information Release (TIR) 00-2 (January 28, 2000) to explain the application of the CCF surcharge,[5] and included the following examples:

"Example: Water-based tours or cruises and entertainment cruises subject to the 5% CCF surcharge include . . . Whale watching tour or cruise . . . provided that the tour, cruise or charter is conducted partly or wholly in Boston (including Boston Harbor)."

"Example: A company enters into a contract with the operator of an entertainment cruise for a number of individuals to participate in an evening cruise in Boston Harbor. Payment of the group admission charge under the terms of the contract is a ticket and is subject to the 5% CCF surcharge."[6]

b. *The standard of review.* "A decision of the board will not be reversed or modified if it is based on a correct application of the law and if it is based on substantial evidence." *Kennametal,*

---

[5]"Massachusetts TIRs are issued by the commissioner of revenue in order to inform DOR personnel and the public of the department's policy and practice. They explain the Department of Revenue's official position in connection with changes in federal or Massachusetts tax laws or on court decisions interpreting federal or Massachusetts tax laws. The commissioner may issue, revoke or modify a TIR without notice or public hearing. The Department of Revenue will use a TIR as precedent in the disposition of cases unless it is revoked or modified." Neary, Handbook of Legal Research in Massachusetts § 8.2.3(e) (2002).

[6]Two other TIRs were issued later by the commissioner interpreting the CCF Act: TIR 03-24 (September 26, 2003) (which expressly revoked and replaced TIR 00-2) and TIR 05-1 (January 25, 2005), 1 Official MassTax Guide PWS-160 to -168 (West 2008) (which expressly revoked and replaced TIR 03-24). Both of the subsequent TIRs contained the same examples, and are identical to TIR 00-2 in all material respects.

*Inc.* v. *Commissioner of Rev.*, 426 Mass. 39, 43 (1997), cert. denied, 523 U.S. 1059 (1998). See *Koch* v. *Commissioner of Rev.*, 416 Mass. 540, 555 (1993). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1(6). "Our review of the sufficiency of the evidence is limited to 'whether a contrary conclusion is not merely a possible but a necessary inference from the findings.' . . . 'In reviewing mixed questions of fact and law, the board's expertise in tax matters must be recognized, and its decisions are due "some deference." ' " *Boston Professional Hockey Assn.* v. *Commissioner of Rev.*, 443 Mass. 276, 285 (2005).

c. *Whale watch cruises.* Mass. Bay first argues that the whale watch cruises were not subject to the CCF surcharge because they were not "conducted partly or entirely within the city of Boston." St. 1997, c. 152, § 9(*d*). We disagree. Surcharging the Boston-based whale watch cruises satisfied the statutory language and purpose. Each whale watch cruise commenced in historic Boston Harbor, where passengers were greeted by a naturalist.[7] As the ship motored through the harbor, the naturalist identified Boston landmarks. A video presentation about whale behavior also started.[8] None of these facts are disputed. As advertised, this was *"Boston's* Most Popular 4-Hour Tour" (emphasis added). The cruise was not limited in place and time to where and when whales were actually being observed. It was, as marketed, a "4-Hour Tour." Although whale sightings on Stellwagen Bank were clearly the cruise's primary attraction, the cruise was being "conducted partly" in Boston Harbor, and that was part of its allure. See St. 1997, c. 152, § 9(*d*). The Legislature only required the cruise to occur "partly," not predominately, in Boston. *Ibid.*

The purpose of the provision — to surcharge the Boston tourism industry to help finance the Boston Convention Center — was likewise being promoted by applying the surcharge to the

---

[7]By emphasizing that the cruise commenced in Boston, the board did not, as Mass. Bay argues, confuse and conflate the requirement that the cruise originate or be located in the Commonwealth with the requirement that the cruise be "conducted partly" in Boston. Leaving from Boston Harbor is relevant to both requirements.

[8]We disagree with Mass. Bay's characterization of these activities as "de minim[i]s."

Boston-based whale watch cruises. See generally Governor's letter submitting proposed act relative to the construction and financing of a convention and exhibition center in the city of Boston and projects in other municipalities, 1997 House Doc. No. 4480 ("This legislation also proposes a unique approach to financing the Boston Convention & Exhibition Center. Simply put, those entities which will benefit directly as a result of the project, the hospitality industry in Greater Boston, will be contributing revenues to defray the costs of construction and operation"). Consequently, in concluding that the whale watch cruises met the "conducted partly in Boston" requirement, the board did not err.[9] It applied the correct legal standard, and there was substantial evidence to support the board's conclusion that the tour was conducted partly in Boston Harbor. See *Kennametal, Inc.* v. *Commissioner of Rev.*, 426 Mass. at 43.

Mass. Bay next contests the board's decision that the whale watch cruises were "sightseeing" or "entertainment" cruises under the CCF Act. The words "sightseeing" and "entertainment" were, however, properly "construed according to their natural import in common and approved usage" by the board. *Commonwealth* v. *Welosky*, 276 Mass. 398, 401 (1931), cert. denied, 284 U.S. 684 (1932). There was also substantial evidence to support the board's determination. Mass. Bay's own Web site touted the whale watch cruises as "Boston's #1 Sightseeing Experience," and Mass. Bay's promotional materials depicted the whale watch cruises as entertainment cruises.

Mass. Bay further contends that the actions taking place *within Boston Harbor*, and not elsewhere on the tour, must be sightseeing or entertainment activities in order to fall within the CCF Act. We conclude that the Boston portion of the trips is part and parcel of the entire entertainment and sightseeing purpose of the

[9]Mass. Bay also argues that the cruises to Stellwagen Bank from Boston Harbor should not be considered "partly conducted . . . within the city of Boston" because they are analogous to bus tours of another city that originate in Boston. Mass. Bay relies on TIR 05-1 to support this argument. The language cited by Mass. Bay only applies to land tours and only if Boston is not included in the tour activities. TIR 05-1. By contrast, the language addressing water-based cruises in TIR 05-01 states that the "Whale Watching tour or cruise . . . [is subject to the surcharge] provided that the tour, cruise or charter is conducted partly or wholly in Boston." TIR 05-1 contains the same relevant language as TIR 00-2 and TIR 03-24. See note 6, *supra*.

cruises. As explained above, the ship's passengers started each cruise by seeing historic Boston Harbor. Also, the identification of Boston landmarks was part of the sightseeing experience and the showing of the whale video was provided as a means of entertaining the passengers of the whale watch cruises.

Mass. Bay finally argues that these latter activities were provided for educational rather than entertainment purposes and therefore no surcharge could be imposed. Such a reading of the statute suggests that they are mutually exclusive. We conclude that they are not: a cruise can be both educational and entertaining and remain subject to the surcharge.[10] The board therefore properly found the whale watch cruises to be "sightseeing" or "entertainment" cruises or tours. See *Kennametal, Inc.* v. *Commissioner of Rev.*, 426 Mass. at 43.[11]

d. *Private charters.* Mass. Bay argues that its private charters are not subject to the CCF surcharge because the revenues from the private charters are not generated pursuant to the sale of individual tickets or group admission charges but rather pursuant to charter contracts. The original CCF Act, which took effect in 1997, provided that water-based cruises and tours should have a "surcharge of 5 per cent of the purchase price imposed on the price of *any ticket*" (emphasis added). St. 1997, c. 152, § 9(*d*). In 1999, the CCF Act was amended to include the following definition of "ticket" and an exception for "bare-boat charters":

> "For purposes of this paragraph, a ticket shall include any individual or group admission charge for said tour or cruise, whether or not evidenced by a written agreement, and a water-based entertainment cruise shall include any cruise of 24 hour duration or less, conducted partly or entirely within the city of Boston, whose primary purpose is not transportation, but shall not include bare-boat charters so called."

---

[10]The only educational exclusion to the surcharge in the statute applies to an "organized school or youth group."

[11]Mass. Bay also mentions, essentially without argument, that the words "entertainment," "sightseeing," and the phrase "conducted partly or entirely within the city of Boston" are ambiguous and should therefore be construed in favor of it as a taxpayer. We find this argument without merit because we can discern no "doubt" in this language that can "be resolved in favor of the taxpayer." *Prudential Ins. Co. of Am.* v. *Commissioner of Rev.*, 429 Mass. 560, 564 (1999).

St. 1999, c. 68, § 17. Reading the statute as a whole, we reject Mass. Bay's argument excluding all its private charters from the surcharge. We place particular reliance on the 1999 amendment.

First, Mass. Bay's private charters were not "bare-boat" charters, the only private charters expressly excluded from the CCF surcharge even if they would otherwise meet all of the applicable requirements.[12] A "bare-boat charter" is a private charter that involves the transfer of possession and control of the boat to a charterer. See TIR 05-1 (bare-boat charter is "where customers have exclusive possession and control of the boat for a specified period of time"). See also Black's Law Dictionary 250 (8th ed. 2004), quoting from Robertson, Friedell & Sturley, Admiralty & Maritime Law in the United States 371-372 (2001) ("charterer takes possession and operates the ship during the period of the charter as though the vessel belonged to the charterer"). Unlike bare-boat charters, Mass. Bay charters provide a captain and crew, employees of Mass. Bay, who retain ultimate control over the vessel to meet safety and legal requirements. See *ibid.* (on bare-boat charter, "charterer provides the personnel, insurance, and other materials necessary to operate the vessel").

By expressly excluding only bare-boat charters, the statute by necessary implication subjects other private charters to surcharges. The question then becomes whether the revenues for these private charters, operated by captains and crews provided by Mass. Bay on Mass. Bay ships, derive from tickets as defined by the CCF Act.[13]

The 1999 amendment expanded the definition of ticket to "include any . . . group admission charge for said tour or cruise, whether or not evidenced by a written agreement." St. 1999, c. 68, § 17. Although there may have been other ways to describe the payments here, they do amount to charges for the admission of groups of people onto Mass. Bay ships operated by Mass. Bay crews for private tours or cruises of limited duration.

---

[12]Mass. Bay argued to the board that its private charters were bare-boat charters, but the board disagreed and Mass. Bay has not pursued this argument on appeal.

[13]The other requirement of the statute also must of course be met. Although not addressed by the parties, and therefore not an issue before us, we do not understand how burials or memorials at sea could satisfy the entertainment or sightseeing requirement for surcharge.

In our view, the 1997 enactment and the 1999 amendment, when read together, demonstrate a clear legislative intent to surcharge private charter arrangements like the ones at issue. Although a group admission charge would not accurately reflect the arrangement of a bare-boat charter, it does reflect what is occurring on a Mass. Bay charter, where Mass. Bay's crew retains control of the ship and admits a group onto the ship for a private tour. Also, to indicate that private charters are subject to the surcharge, but then conclude that the ordinary charter agreements at issue here are not covered, would appear to defeat the legislative purpose. Rather, we read the language adopted by the Legislature to cast a wide and tight revenue net for privately chartered tours and cruises that avoids loopholes dependent on the type of agreement negotiated.

Our reading of the statute is further supported by the commissioner. In TIR 00-2, issued on January 28, 2000, the commissioner provided the following example:

> "A company enters into a contract with the operator of an entertainment cruise for a number of individuals to participate in an evening cruise in Boston Harbor. Payment of the group admission charge under the terms of the contract is a ticket and is subject to the 5% CCF surcharge."

This example, which preceded the dispute in the instant case, and which has appeared in subsequent TIRs, reflects a consistent interpretation of the statute by the commissioner, the person charged with its administration and enforcement. See generally *Lowney* v. *Commissioner of Rev.*, 67 Mass. App. Ct. 718, 722-723 (2006). The commissioner's consistent interpretation confirms our own.

3. *Conclusion.* We conclude that the board correctly interpreted the CCF Act and that its decision was supported by substantial evidence. See *Kennametal, Inc.* v. *Commissioner of Rev.*, 426 Mass. at 43. We therefore affirm the decision of the board that Mass. Bay's whale watch cruises and private charters are subject to the CCF surcharges.

*So ordered.*