# COMMONWEALTH vs. STEVEN MORETON.

No. 97-P-2199.

Barnstable. October 7, 1998. - November 16, 1999.

Present: WARNER, C.J., ARMSTRONG, BROWN, SMITH, & BECK, JJ.[1]

*Larceny. Embezzlement. Practice, Criminal,* Required finding. *Evidence,* Intent. *Intent.*

Where, at the trial of a complaint alleging larceny (embezzlement) over $250, no direct or circumstantial evidence of criminal intent was introduced, the defendant was entitled to a required finding of not guilty. [217-220] BROWN, J., with whom SMITH, J., joined, dissenting.

COMPLAINT received and sworn to in the Orleans Division of the District Court Department on June 2, 1997.

The case was heard by *Robert A. Welsh, Jr.*, J.

*R. Scott Miller, Jr.*, for the defendant.

*Linda A. Wagner*, Assistant District Attorney, for the Commonwealth.

BECK, J. On a citizen complaint charging the defendant with larceny by check and larceny over $250, a judge of the Orleans District Court found the defendant not guilty of the check charge and guilty of the larceny. The defendant was placed on one year's administrative probation, and was ordered to pay restitution in the amount of $2,915.89. The property alleged to have been stolen was the proceeds from the sale of a blue fin tuna, delivered to the defendant for sale in Japan. On appeal, the defendant claims his motion for a required finding of not guilty, Mass.R.Crim.P. 25(a), 378 Mass. 896 (1979), filed at the close of the Commonwealth's case and renewed at the close of all the evidence, should have been allowed because the Commonwealth failed to prove the requisite criminal intent. We agree.

[1]After circulation of the opinion to the other Justices of the Appeals Court, the panel was expanded. See *Sciaba Constr. Corp.* v. *Boston*, 35 Mass. App. Ct. 181, 181 n.2 (1993).

*Facts.* The Commonwealth put on its case through the complaining witness, Henry Souza, a commercial fisherman and captain of a whale watching boat. Taking Souza's testimony in the light most favorable to the Commonwealth, *Commonwealth* v. *Cordle*, 412 Mass. 172, 175 (1992), the facts of the Commonwealth's case were as follows.

On October 1, 1996, Souza caught a 386 pound blue fin tuna in the waters off Cape Cod. At the dock, Souza showed the fish to buyers from three different companies. He testified that he chose Gulfstream Seafood, Inc. (Gulfstream, of which the defendant was the owner and president), because "Mr. Moreton's company told me that I could be paid within a week. The other two couldn't give me a date; and that was the main reason I sold to Mr. Moreton's company." A little over a week later, Souza learned that the tuna had been sold at auction on October 5, and that his share of the proceeds was $2,915.89.

In the succeeding weeks, Souza repeatedly called the defendant and the Gulfstream employee who had represented the company on the dock, demanding his money. On at least one occasion, the employee told Souza the defendant was in Japan. On November 14, Souza spoke to the defendant on the telephone. The defendant agreed to send Souza a check immediately. Upon receiving the check, Souza telephoned the bank to ask whether there were sufficient funds to cover the check. There were not. Souza then called the defendant again, who told him to hold the check for a few more days. Several days later, Souza called the bank again, but there were still insufficient funds to cover the check. Souza testified that he was "in contact with the bank manager. She called [the defendant], and they . . . seemed to work something out. She told [Souza] to try again in a couple of days; that she was sure it would be resolved." It was not resolved. When Souza called the defendant again, the defendant said that "if [Souza] pursued it anymore, if [he] tried to deposit [the check] or take any kind of legal action against [the defendant], [the defendant] was going to file bankruptcy."

Around December 11, Souza deposited the check anyway in order to have a record that there were insufficient funds. The check was returned. Souza called the defendant but the defendant did not return Souza's calls. About a week later, Souza received a "bankruptcy notice." He filed a claim in the subsequent Gulfstream bankruptcy proceedings.

Some months later, on March 20, 1997, Souza filed an application for a criminal complaint against the defendant in the Orleans District Court in two counts: larceny by check and "embezzlement larceny." Following a hearing on May 27, 1997, the court issued a two-count complaint on June 2, 1997.

The case was tried jury-waived on September 3, 1997, in the Orleans District Court. At the conclusion of the Commonwealth's case, the defendant moved for a required finding of not guilty. The motion was denied. The defendant renewed the motion at the conclusion of all the evidence. At that point, the judge concluded that "the goods were placed in consignment in the first place . . . [and that] by failing to turn over Henry's share of the money [after the auction] the Defendant committed a larceny." The judge found the defendant guilty of the larceny and not guilty of the larceny by check.

*Discussion.* Our standard of review on a motion for a required finding of not guilty is, considering the evidence in the light most favorable to the Commonwealth, "whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v. *Cordle*, 412 Mass. at 175. A conviction may rest entirely upon circumstantial evidence, but no essential element may rest on surmise, conjecture or guesswork. *Commonwealth* v. *Donovan*, 395 Mass. 20, 25 (1985).

Souza's application for the criminal complaint set out a count for "embezzlement larceny," and the case appears to have been tried on this theory. See *Commonwealth* v. *Nadal-Ginard*, 42 Mass. App. Ct. 1, 5 n.6 (1997) (despite merger of all types of larceny in a single statute, separate crimes survive). To convict the defendant of embezzlement, the Commonwealth must prove that the defendant "unlawfully, and with intent to steal or embezzle, convert[ed] . . . the property [of Souza]." G. L. c. 266, § 30(1). " '[T]heft by embezzlement must be an intentional and fraudulent appropriation' and . . . for conviction 'it must be beyond a reasonable doubt that the [d]efendant had a criminal intent to defraud.' " *Commonwealth* v. *Carson*, 349 Mass. 430, 437 (1965). See Model Jury Instructions for Use in the District Court, Instruction 5.415 (1997). See also Perkins, Criminal Law 852 (3d ed. 1982) (in order to constitute larceny, there must be "wilful misuse of another's property . . . with an additional design in mind . . . [the] intent to steal").

In cases in which the inference of an intent to steal or defraud

is warranted, there is some evidence of an affirmative effort to mislead the owner of the property. See, e.g., *Commonwealth* v. *O'Connell*, 274 Mass. 315, 321 (1931) (inference of intent to deprive permanently warranted where administrator of estate violated court order as to use of estate's funds); *Commonwealth* v. *Hull*, 296 Mass. 327, 330 (1937) (defendant "put [customer] off" with a false statement that he could not get delivery of bonds, whereas he had intentionally used proceeds intended to purchase bonds to cover his own business expenses); *Commonwealth* v. *Anthony*, 306 Mass. 470, 475 (1940) (intentionally false material representations as to financial condition of brokerage firm). There was no such evidence here. At best the evidence shows that the defendant accepted delivery of Souza's tuna, agreed to pay the proceeds to Souza within a week of selling the fish, did not pay Souza on the promised date or in the weeks thereafter, and then declared bankruptcy without having paid Souza. There is simply no direct or circumstantial evidence of criminal intent. The defendant's motion for a required finding therefore should have been allowed. *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979) ("[T]o sustain the denial of a directed verdict, it is not enough for the appellate court to find that there was some record evidence, however slight, to support each essential element of the offense; it must find that there was enough evidence that could have satisfied a rational trier of fact of each such element beyond a reasonable doubt"). The analysis of the dissent relies heavily on the characterization of the transaction here as a consignment. However, in our view the parties' description of the transaction as a consignment does not materially change the analysis. There still must be evidence of criminal intent to support a conviction of larceny.

Moreover, it is not clear that the agreement here was actually a consignment. The invoice, which is included in the record appendix but may or may not have been introduced in evidence, is a six by eight and one-half inch form with the weight of the tuna and the word consignment written on it. It is dubious whether the word consignment on the invoice is sufficient to establish the transaction as a consignment, without any evidence of the understanding of the parties as to the details of the arrangement. See *Sturm* v. *Boker*, 150 U.S. 312, 326-327 (1893) (terms of the agreement, not invoice, establish nature of transaction). Here there is no evidence of any agreement about price, share of profits, treatment of proceeds, or responsibility for

disposal of the fish if it were not sold. Contrast *Deyrmanjian* v. *Palais*, 311 Mass. 553, 554 (1942) (consignment contract addressed specific responsibilities of parties). Indeed, Souza acknowledged substantial ignorance about the details of the transaction into which he had entered, including where the fish would be sold, who would buy the fish, how the fish would be shipped, and how the shipper would be paid. Nor was there evidence of any agreement that the proceeds of the auction sale of this particular tuna would be segregated from the proceeds of other such sales. See Hawkland, Consignment Selling Under the Uniform Commercial Code, 67 Com. L.J. 146, 147 (1962) (notwithstanding description of agreement as consignment, arrangement treated as "sale, conditional sale or chattel mortgage" where agreement failed to specify segregation of goods or proceeds).

The mere failure to make good on a commercial transaction, whether a consignment or a transaction by another name, particularly in the context of a bankruptcy, does not establish the criminal intent required for an embezzlement conviction. See *In re Phillips*, 882 F.2d 302, 305 (8th Cir. 1989) (no malice where "no evidence that [debtors' decision to use funds in their account to repay other creditors and not claimant] was based upon anything other than an attempt to keep [company] going as a viable business entity . . . capable of repaying [claimant]"); *In re Littleton*, 942 F.2d 551, 554-555 (9th Cir. 1991) (no malice where debtors breached security agreement, but sought additional financing and acted with good faith hope and expectation of keeping the business solvent).

At most, the evidence here supports an action for breach of contract, or perhaps an action in tort for conversion, presumably one of many possible such cases against the defendant, given the state of his bank account and his company's declaration of bankruptcy. There was no evidence that the defendant took the fish under false pretenses intending to retain the proceeds, or that he decided to keep the proceeds at some later time. In fact there was no evidence at all regarding the disposition of the proceeds. The mere failure to pay within seven days in these circumstances is not sufficient to support an inference of larcenous intent.

Finding criminal liability on these facts is inconsistent with the longstanding policy objectives of the Bankruptcy Act — to give the debtor a structured opportunity to resolve his debts and

make a fresh start, and to ensure equality of asset distribution among creditors. See Crandall, The Law of Debtors and Creditors par. 10.02[2], [3] (rev. ed. 1991). Souza had an option under bankruptcy law to avoid lining up with the defendant's other creditors. He could have filed a complaint in the bankruptcy court for a determination under the civil preponderance of the evidence standard that the defendant's debt to him was nondischargeable on the grounds that the defendant embezzled the proceeds, 11 U.S.C. § 523(a)(4), see *In re Phillips*, 882 F.2d at 303, or converted them wilfully and maliciously. 11 U.S.C. § 523(a)(6). See *In re Littleton*, 942 F.2d at 554.

Instead, Souza insisted not only on the proceeds but on punishment. Rather than providing a "sanctuary from the jungle of creditors' pursuit of their individualistic collection efforts," Appendix B Collier, Bankruptcy 4-318 (15th ed. rev. 1999) (legislative history, commission report), conviction on these facts ensures that the defendant will bear the stigma of a felony conviction along with the hardship of bankruptcy. It will also burden transactions of the sort at issue here to the ultimate disadvantage of all the parties.

*Judgment reversed.*

*Finding set aside.*

*Judgment for the defendant.*

Brown, J. (dissenting, with whom Smith, J., joins). This case implicates an important issue: namely, whether the conduct described in the complaint lies within the purview of the criminal law. I am of opinion that it does, and respectfully dissent.

I recognize that the question presented here has potentially far-reaching effect. If unpaid commercial vendors, in general, are given the ability to haul delinquent customers before the criminal courts, long settled expectations as to the nature of business relationships would be altered. The civil law, as derived from sources such as the Uniform Commercial Code and the Bankruptcy Code, typically has provided the exclusive mechanism for resolution of disputes between merchants and their customers. The debtors prison is an element of the English legal system that was not imported here. This, however, is an unusual case.

To prove larceny, it is necessary for the government to establish that (1) something specific was taken (and in the case of the precise offense charged here, that the item in question had a value in excess of $250); (2) that the item purloined was the property of another; and (3) that the defendant took it with the specific intent to permanently deprive the victim of his property. See *Commonwealth* v. *Johnson*, 379 Mass. 177, 181 (1979).

The parties, in their briefs, evince some confusion over the first point: namely whether it was money or a fish that the defendant pilfered. To the extent that the fact finder expressly indicated that the conviction was based upon the theft of the money, I conclude that we are bound to justify the conviction, if at all, upon that theory.[1] Just as well, perhaps, for by all appearances the victim tendered the fish voluntarily, and authorized the defendant's firm to broker a sale. Indeed, the victim had no grievance until after the auction when he did not receive his portion of the proceeds.

The next issue is a little thornier: to whom did the money from the sale belong. If the defendant — or perhaps even his business — had title to the funds, subject perhaps to some form of commercial obligation to the victim, the conviction likely could not stand. Here, however, the civil law intervenes. Unless otherwise agreed, title to any property *consigned* for sale remains with the consignor. In civil law terms, a bailment is created. See *Aldrich* v. *Hodges*, 164 Mass. 570, 571 (1895). See also *Sturm* v. *Boker*, 150 U.S. 312, 329 (1893).[2] Likewise, the consignor retains title to the proceeds of any sale until the

[1]At the conclusion of all the evidence, the judge found the defendant guilty of larceny but not guilty of larceny by check. The judge then observed, "[t]he larceny, if it occurred at all, occurred on the failure to account for the funds after the [fish] auction.

"And I think by failing to turn over [Souza's] share of the money at that point in time that the [d]efendant committed a larceny."

[2]The court in *Sturm* v. *Boker*, 150 U.S. at 329-330, stated, "The recognized distinction between bailment and sale is that . . . the title to the property is not changed. . . .

"[An] agency to sell and return the proceeds . . . stands upon precisely the same footing, and does not involve a change of title. An essential incident to trust property is that the trustee or bailee can never make use of it for his own benefit." The most widely cited modern commentator takes exactly the same approach: "A consignment of goods for sale does not pass the title at any time, nor does it contemplate that it should be passed. The very term implies

consignee remits the consignor's share. After the auction, therefore, legal title to the funds remained with the victim. When the defendant converted the money to his own use, he unambiguously took something that belonged to another.[3]

This last point is what takes this case out of the realm of most business transactions. A larceny conviction ordinarily would not be appropriate where, for example, a businessman orders his monthly supply of staples on credit, and then discovers at the end of the month that he does not have the money to pay the bill. In these circumstances, nothing was stolen — at least not for the purposes of G. L. c. 266, § 30. The staples were supplied voluntarily by the vendor, and title passed to the purchaser at the time of delivery. See G. L. c. 106, § 2-401(1)-(2). The unpaid bill amounts to a commercial debt that may become the subject of a tort claim, but it is not a tangible res that may be converted. See G. L. c. 106, §§ 2-607(1), 2-709(1)(*a*), 2-401(2).

I disagree with the majority; the reasoning and result I reach would not implicate a vast majority of commercial transactions. Rather, its application is limited strictly to the realm of consignment sales and cognate arrangements. What is unusual, and, for me, ultimately dispositive, about the instant situation is that the victim here retained legal title, first to the tuna, and then to the auction proceeds. The diversion of the latter to the defendant's own purposes satisfied the second element of the crime of larceny — conversion of the tangible property of another. The staple vendor could make no similar claim.

If this seems an overly technical basis on which to determine whether or not conduct falls within the reach of the larceny statute, in practice, it is usually quite clear that a consignee is accepting a special responsibility for the property of another for

an agency, and the title is in the consignor, the consignee being his agent." Hawkland, Consignment Selling Under the Uniform Commercial Code, 67 Com. L.J. 146, 147 (1962), citing *Rio Grande Oil Co.* v. *Miller Rubber Co.*, 31 Ariz. 84 (1926).

[3]In many key respects, this case mirrors the situation in *Commonwealth* v. *Hull*, 296 Mass. 327, 329-330 (1937). There the defendant, a stockbroker, was entrusted with securities. The owner instructed the defendant to sell the bonds and deliver up the proceeds. The defendant agreed. However, after selling the bonds, he used the proceeds to secure unrelated debts of his employer. In these circumstances, the court concluded that the defendant could be convicted of larceny of *either* the bonds (since there was evidence that he intended to convert them to his employer's use from the outset) *or* the proceeds from the sale. *Id.* at 330.

potential sale. This is often an advantageous arrangement for a merchant: as noted already, where goods are advanced on credit, they become a merchant's property, and he is required to pay for them whether sold or unsold. In exchange for the reduced risk associated with a consignment sale — where unsold items are simply returned, see *Deyrmanjian* v. *Palais*, 311 Mass. 553, 554 (1942) — a concomitant burden settles on the consignee to safeguard the consignor's property, segregating it from his own assets. Here the defendant forgot this obligation, and treated what he knew to be the victim's property as though it were his own. This is the essence of larceny.

In the end, this is a fairly simple case. The victim caught a fish, and entrusted it to the defendant for the narrow purpose of conveying it to auction. In these circumstances, the defendant was the victim's agent, a mere factor — no reasonable argument can be made that ownership of the fish ever passed to the defendant. Indeed, the majority never identifies any specific moment when title to the fish plausibly might have passed to him. When, after the auction, the defendant pocketed the proceeds, he stole the victim's money.

As to the question of the defendant's intent — i.e., whether he intended to deprive the victim of his share of the sale proceeds indefinitely or only until his business fortunes changed — unlike the majority, I defer to the fact finder. Intent, relating as it does to a subjective state of mind, almost never is proved by direct evidence. See *Commonwealth* v. *Stewart*, 411 Mass. 345, 350 (1991). The trial judge, who had the opportunity to observe the witnesses firsthand, apparently concluded that the defendant had it in mind to keep the victim's money. I cannot fairly say that such an inference was wholly unsupported by the evidence here.[4] See *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979).

[4]While the majority is correct that there was no direct evidence of the defendant's intent here, I note that the intent required for a larceny conviction (i.e., an intent to deprive the victim of his property permanently) may be inferred from actions that suggest indifference as to whether a victim recovers his property. See *Commonwealth* v. *Souza*, 428 Mass. 478, 490 (1998). Here, such indifference reasonably might be inferred from the fact that the defendant accepted a consignment knowing the fragile state of his business, and the concomitant likelihood that the defendant would not be able to remit the victim's money to him after the auction. Further, unlike the majority, I see no necessity for the defendant to have hatched a plan to steal from the victim at the time of the consignment. It would suffice to support the conviction here

Lastly, the majority, without pointing to any case authority, suggests that the Bankruptcy Code provides the sole medium through which the victim can find a remedy here. In essence, the majority argues that the bankruptcy laws have preempted the criminal law in this area. This is a spurious assertion. State criminal law is a matter purely of State concern. Although it is possible that Congress, acting through the power of the commerce clause, might preempt the right of a State to enforce its criminal laws, no authority — statutory or common law — has been presented that even suggests that the Bankruptcy Code ever has been interpreted to have such preemptive effect. In the absence of any such authority, I reject the majority's novel construction.

even if it could be inferred that the notion to steal only crossed the defendant's mind once he had the auction proceeds in hand.