van Gestel, J.
By Order dated January 7, 2000, this Court bifurcated the trial of this case. The first phase to be litigated and resolved was thereby limited to those matters relating to the plaintiffs standing and title to sue in this action. Included were those facts and legal issues relating to: (1) the title to the tugboat Luna for the period from January 1, 1990, to December 31, 1995, Including any changes or transfers of such title; and (2) the predicates upon which the plaintiffs right to bring this action are based.
The Court makes the following findings of fact and rulings of law, culminating in its order for judgment.

FINDINGS OF'FACT

The tugboat Luna had a long and historic career, mostly in Boston Harbor. For purposes of this phase of this trial, that history need not be detailed. It was significant enough, however, to warrant the Luna's designation as a National Historic Landmark and a Boston Landmark, and as a property listed on the Massachusetts National Register of Historic Places.
In July of 1984, long after her retirement from active service, the Luna and her sister tugboat, the Venus, were permitted by the defendant Metropolitan District Commission (“MDC”) to occupy a location in the Charles River Basin on the Boston side of the river, just upriver from the Charles River Dam and the Museum of Science. In the latter part of the 1980s and the early 1990s, the condition of the two tugs deteriorated extensively.
*453 At some time not here material, but in any event well before January 1, 1992, an entity called Terra/Mare Research and Education Society, Inc. (“Terra/Mare”) became the record owner of the Luna.[1] For a time, at least until the summer of 1991, Frances Gage (“Gage”), a principal of Terra/Mare, lived aboard the Luna and saw to its security and upkeep, at least within Terra/Mare’s somewhat meager resources.
On January 3, 1990, while under the control of Terra/Mare, the Luna sank in the Charles River. However, the sinking was not quite as catastrophic as it sounds. The Luna was located at the river’s edge and simply settled a few feet to the bottom, such that only the stern was below water. Nevertheless, on January 4, 1990, the MDC withdrew permission for the Luna to remain in the Charles River.
Gage, and others, embarked on a series of efforts to salvage the Luna and to protect the sister tug, Venus. Those efforts, for the most part, culminated in the summer of 1991. Gage was introduced by a representative of the MDC to a man named David Venditti (“Venditti”). Venditti supposedly had some knowledge and skill in the salvaging of vessels. On July 3, 1991, Gage essentially turned over the fate of the two vessels to Venditti when Gage gave him the right to “board and secure the vessels and begin salvage operations.” It was then that Gage permanently vacated the Luna, which had become uninhabitable and inoperable.
Venditti’s skills were not as advertised. Shortly after his assumption of control over the two tugs, he not only failed to salvage the Luna, but also his efforts in refloating the Venus resulted in the sinking of her again, this time in considerably deeper water. Venditti’s presence and involvement with both tugs ended in late July or early August of 1991, soon after they had begun.
Records of the Division of Public Charities of the Department of the Attorney General reveal that for the fiscal year ending March 31, 1984, Terra/Mare listed total assets of $71,347.96, and described a program of “restoration of historic tugboats to promote maritime knowledge of the general public.” By the fiscal yearendingMarch31, 1992, Terra/Mare’s total assets were listed as “$0.”
On August 29, 1991, the MDC notified and directed Gage to remove the Luna and the Venus from the Charles River Basin within 30 days. A nearly identical notice was sent to Venditti on September 4, 1991. Neither Gage nor Venditti responded to or complied with these notices.
On May 28, 1992, the MDC entered into an agreement with the defendant Boston Graving Dock Corp. (“BGD”) for the removal of the two tugs from the Charles River Basin.[2] This agreement called for preparation for and removal from the Charles River Basin of the Luna and the Venus. The work was to get the vessels “prepared to be transited and towable for delivery to a designated third person or to sea for disposal and there to be scuttled pursuant to the OPTION selected by the [MDC].”
On July 10, 1992, again exercising its authority pursuant to G.L.c. 92, secs. 72 and 73, the MDC gave another written notification to Terra/Mare, through Gage, and to Venditti of its intention to remove the Luna and the Venus from the Charles River Basin. This notice advised “that pursuant to [the MDC’s] statutory authority under [G.L.c. 92, secs. 72 and 73] the MDC will remove and dispose of both vessels.” The notice further advised Gage of the rights of the owner of the vessels, at the owner’s expense, to arrange for removal of the vessels and warned that unless this was done, the MDC would “proceed with its plan for removal and sale or scuttling of the vessels as authorized by law.” Terra/Mare took no action in response to the MDC’s July 10, 1992 notice.
In early 1992, perhaps sooner, a group of individuals[3] who named themselves “The Luna Preservation Society” began discussions with the MDC about the possibility of saving the Luna from scuttling at sea or other destruction. The Venus was apparently beyond rescue. The group later incorporated themselves as The Luna Preservation Society, Inc. (“LPS”), the plaintiff in this action.
On August 23, 1992, the MDC and the LPS entered into a written agreement relating to the Luna.[4] Among other things, this agreement set forth the following: it noted the MDC’s conclusion “that the tugboats LUNA and VENUS constitute an obstruction to the safe and convenient navigation of the Charles River Basin and present an imminent danger of pollution to the natural environment”; it observed that “notice has been given to persons being the owners or having an interest therein, or as having or exercising control over [the] tugboats, to remove them from their location in the Charles River Basm[, ] but said persons have failed and refused to comply with the demands of [the] notice”; and it acknowledged that the MDC, “pursuant to the authority granted by MGL Chapter 92, sections 72 and 73, may take charge of such vessels, remove them from the Charles River Basin and dispose of them.”
The MDC/LPS agreement recited that it would award a contract for the removal of the Luna and the Venus. (This contract, of course, was the MDC agreement with BGD already executed on May 28, 1992.) The contractor (BGD) was to do the necessary work “to raise, float, mitigate hazardous materials, take off certain on board items to be retained by the MDC and transferred to LPS, and otherwise be prepared to [have the tugs] be transported for disposal at sea by scuttling.” The MDC, however, in its agreement with LPS, retained “the option of delivering the LUNA to a third party at a site located in Boston Harbor.”
The MDC/LPS contract further contemplated that LPS would enter into an agreement with the owners and operators of Fitzgerald Shipyard in Chelsea, Mas *454 sachusetts, “providing for the acceptance of delivery of the LUNA on the ways of the shipyard at the time of the delivery of the vessel by” the MDC’s contractor. That delivery was not to “occur before July 27, 1992, and no later than sixty days from the issuance by the [MDC] to its contractor of a notice to proceed . . .” The Court notes, again, that the MDC/LPS agreement was “entered into” on August 23, 1992, and observes this to be some 27 days after the July 27, 1992, first date for delivery of the Luna to the Fitzgerald Shipyard by the MDC’s contractor.
It is also notable that the MDC/LPS agreement provides that all “costs, expenses, and liabilities arising out of activities with the LUNA, as well as with the vessel itself, which arise from activities after the LPS assumes responsibility, [by acceptance of delivery at Fitzgerald Shipyard], shall be borne by LPS . . .”
The actual removal by BGD of the Luna from the Charles River Basin occurred on August 12 and 13, 1992 — ten days before the effective date of the MDC/LPS agreement. In that removal, the Luna was first towed to the Fitzgerald Shipyard in Chelsea. That yard, however, refused to accept the Luna, possibly because the Fitzgerald facility was not yet ready or available to do so. As a result, BGD towed the Luna to its own dock in East Boston. There the tug remained until March 28, 1995.
It is for the alleged damage to the Luna from the time that it was first towed from the Charles River Basin in August of 1992 until the time the vessel was delivered to LPS in 1995 that LPS has brought the claims against the MDC and BGD. During that period, once the tug was brought to BGD’s facility in East Boston, it remained there, sometimes sunken in the salt water of Boston Harbor and sometimes in a dry-dock facility. No one from Terra/Mare or LPS was shown to have taken any action in that long period of time to claim or assert any rights to the Luna.
On December 15, 1994, the Massachusetts Surplus Property Office issued a notice of sale of the “surplus tugboats” Luna and Venus. Bids were solicited, to be submitted by 2:00 p.m., January 5, 1995, at which time they were to be publicly opened and read.
In February of 1995, LPS filed this action. It was in the course thereof, mostly in connection with LPS’s request for injunctive relief, that on March 13, 1995, the MDC entered into a consent order wherein it gave LPS until March 28, 1995, to take custody of the vessel. It was at that latter point in time that LPS first assumed control of the Luna.
On April 8, 1995, LPS received from Terra/Mare a bill of sale and an assignment of whatever rights Terra/Mare may then have had in the Luna, including any such rights to bring a claim for damages the vessel sustained for the period from August 12, 1992, to March 13, 1995.

RULINGS OF LAW

The Court begins its rulings of law by examining the charges brought by the plaintiff in its second amended complaint. There are five counts: (1) Count I, a claim for damages to property, charges BGD with actions that either caused damage to the Luna or failed to prevent damage to the vessel while in its possession, custody or control; (2) Count II makes similar claims against the MDC; (3) Count III claims damages against the MDC for its failure to deliver the Luna to LPS and thereby permitting damage at the hands of BGD; (4) Count IV is a claim against the MDC for breach of its duty under G.L.c. 9, Sec. 27C, thereby causing, permitting, suffering or tolerating damage to the Luna; and (5) Count V claims LPS to be a third-party beneficiary of the contract dated May 28, 1992, between the MDC and BGD and seeks compensation for damage later sustained by the Luna.
The first three counts all involve claims in the nature of negligently causing or permitting damage to the Luna. “A cause of action in negligence requires the breach of duty which is the proximate cause of a plaintiffs injury.” Ortiz v. Hampden County, 16 Mass.App.Ct. 138, 140 (1983). Negligence cannot exist in the absence of some act or omission in violation of a legal duty. Little v. Lynn & Marblehead Real Estate Co., 301 Mass. 156, 159-60 (1938); Royal Indemn. Co. v. Pittsfield Elec. Co., 293 Mass. 4, 6 (1935).
BGD and the MDC had a duly to the owner or to the person properly in custody or control of the Luna not to cause damage, or by omission to permit damage to be caused, to the vessel. In order to sustain a claim of negligence, a plaintiff must show that a defendant owed it a duty of care. Spinner v. Nutt, 417 Mass. 549, 552 (1994); Mounsey v. Ellard. 363 Mass. 693, 707 (1973). Any such duty, however, does not exist in the abstract. When it is personal property that is damaged, the duty runs to the owner of that property or to the person or entity that is in rightful possession thereof. See, e.g., Larabee v. Potvin Lumber Co., Inc., 15 Mass.App.Ct. 225, 227, 390 Mass. 636, 640 (1983); Laurin v. DeCarolis Construction Co., 372 Mass. 688, 691 (1977); Associates Discount Corp. v. Gillineau, 322 Mass. 490, 492 (1948); Priority Finishing Corp. v. LAL Const. Co., Inc., 40 Mass.App.Ct. 719, 721 (1996).
Assuming for the purposes of this first phase of the trial only that either BGD or the MDC, or both, were negligent and thereby caused damage to the Luna at some time between August 12, 1992, and March 28, 1995, it then becomes necessary to determine whether there was any duty owed to LPS during that time period or, if not, whether any right to sue for such damage was in some way assigned or otherwise conveyed to LPS by the person or entity with such a right to sue. This requires an analysis of the title to, and the right to sue for damages on behalf of, the Luna during the time in question.
*455 On August 12, 1992, title to the Luna was probably still in Terra/Mare. The Court uses the word “probably” despite acknowledging the strong evidence that by the summer of 1992, Terra/Mare had abandoned its interest in the vessel. It had, after all, been over a year since Gage lived aboard the tug or had much of anything else to do with it, and about two and a half years since the sinking on January 3, 1990. Given the actions by the MDC under G.L.c. 92, Secs. 72 and 73, however, it is not necessary to plumb the somewhat murky legal depths of abandonment in the common law or maritime sense. See, e.g., Commonwealth v. Maritime Underwater Surveys, Inc., 403 Mass. 501, 504-06 (1988). Nor need the Court explore the application of the common law doctrine of bona vacantia to the situation before it. See, e.g., Standard Oil Co. v. New Jersey, 341 U.S. 428, 435-36 (1951); Massachusetts Society for Prevention of Cruelty to Animals v. Commissioner of Public Health, 339 Mass. 216, 225-26 (1959).
G.L.c. 92, Sec. 72, grants to the MDC:
the same authority relative to wrecked vessels or other shipwrecked property on the shores or waters of the Charles River Basin as is given the department of highways by section thirty-eight of chapter ninety-one relative to such vessels on property or other shores or waters of the commonwealth; and the [MDC] shall have the same authority relative to removal from said basin of wrecked, sunken or abandoned vessels, or of any unlawful or unauthorized structure or thing deposited or suffered to remain in the waters of said basin and obstructing safe and convenient navigation therein as is given said department by sections thirty-nine to forty-five, inclusive, of chapter ninety-one, relative to such removal from the tide waters of the commonwealth, and said sections, so far as applicable, shall apply to such removals by the [MDC]; provided, however, that the [MDC] shall cooperate with the board of underwater archaeological resources in the salvage of underwater archaeological resources in accordance with section sixty-three of chapter ninety-one.
Furthermore, pursuant to G.L.c. 92, sec. 73:
The [MDC] shall have the same authority relative to the breaking up and disposing of old vessels and other floating structures in said Charles River Basin that is given to the department of highways by sections forty-six to forty-nine, inclusive, of chapter ninety-one in relation to the harbors of the commonwealth.
G.L.c. 91, Sec. 39, by c. 92, Sec. 72, grants to the MDC the authority to remove or cause to be removed “a wrecked, sunken or abandoned vessel, or any unlawful or unauthorized structure or thing, deposited or suffered to remain” in the waters of the Charles River Basin. By the summer of 1992, the Luna was a “sunken” and possibly “abandoned” vessel, and its continued presence in the Charles River Basin was “unlawful” and “unauthorized.” G.L.c. 91, Sec. 40, also by c. 92, Sec. 72, directs the MDC to give written notice to the owner of such a vessel or structure to remove the same within a time therein specified. Here such a notice was given to Terra/Mare on July 10, 1992, commanding the removal of the Luna within ten days from the date thereof. Terra/Mare utterly failed to comply with the notice to remove.[5]
By the authority of G.L.c. 91, Sec. 41, bye. 92, Sec. 72, the MDC may “remove such vessel or other obstruction, or complete the removal thereof, or cause the removal to be made in such manner and to such place as it deems best. . .” By that same section, “the necessary cost and expense of such removal, if not paid by some owner or other person liable therefor, shall” be paid by the Commonwealth. Neither Terra/Mare, nor anyone else, ever paid or otherwise reimbursed the MDC for the cost and expense involved in removing the Luna.
“If the cost and expense of removing a vessel or other obstruction as aforesaid is not paid or repaid by some owner or other person liable therefor within ten days after such removal has been completed, the [MDC] may sell such vessel or other obstruction . . . at public or private sale, and the net proceeds of such sale shall be paid to the commonwealth and deducted from the amount to be repaid or recovered as provided in the preceding section.” G.L.c. 91, Sec. 43.
All of the foregoing steps were taken and completed before the MDC entered into the August 23, 1992 contract with LPS; and all were accomplished with full notice to and total lack of response from Terra/Mare. At this point in time — after removal of the Luna on August 13, 1992, and before August 23, 1992— Terra/Mare must be deemed to have abandoned the Luna. Given the history from the time of the January 3, 1990 sinking through the summer of 1992, certainly the failure to act in response to the MDCs twice-noticed action to remove the Luna is adequate proof of Terra/Mare’s intent to abandon the vessel and actual abandonment or nonuse. See, e.g., Walker-Rogers Post No. 662, Veterans of Foreign Wars of U.S., Inc. v. Vigeant, 10 Mass.App.Ct. 860, 861 (1980). It was the “relinquishing of a right or interest with the intention of never again reclaiming it.” Black’s Law Dictionary, (7th Ed., 1999).
Even if “abandonment” is seen as an inapposite legal term to describe the situation of the Luna in late August of 1992, certainly by that time, Terra/Mare legally had been stripped of all authority to control, sell or otherwise dispose of the vessel now in the custody of the MDC by application of G.L.c. 92, Sec. 72 and c. 91, Secs. 39-43. Upon a transfer of the Luna by the MDC to another, Terra/Mare no longer had a right to regain title thereto, nor, it would seem, could Terra/Mare exercise any right of redemption by paying the MDC for the cost and expense of removal.
*456 Whatever the nature of the title or right the MDC had in the Luna after August 13, 1992, it was enough for it to pass full title thereto to a purchaser at a public or private sale. Here, of course, there was no such sale. Rather, the Luna remained at the BGD dock, unclaimed by anyone, until at least March 13, 1995. It was not until then, in 1995, that the MDC, as part of a consent order at the commencement of this action, purported to conditionally convey title to the Luna to LPS. Recall that the MDC/LPS agreement included only an option in the MDC “of delivering the LUNA to a third party at a site located in Boston Harbor.” Until that option was exercised, neither title to nor possession of the Luna passed to LPS. Further, the condition precedent to such transfer of title or possession was LPS’s making arrangements for the removal of the Luna from BGD’s dock to some other appropriate place and then becoming fully responsible for the care and keeping of the vessel. This condition precedent was not satisfied until March 28, 1995. The MDC, however, seems to have had full legal authority to dispose of whatever right or title it had in the vessel in this manner.
The Court rules that the transfer of the Luna to LPS by the MDC was the legal occasion upon which LPS, for the first time, gained any right in the vessel. The damages charged in the LPS’s second amended complaint, however, occurred between August 12, 1992, and the date of the March transfer, not thereafter.
The March 13, 1995, consent order conveying rights to the Luna to LPS can only be read to pass title or the right to custody of the vessel. It cannot be so broadly interpreted as to constitute an assignment by the MDC of any cause of action it may have against anyone doing damage to the Luna while in MDC custody or control.
There appears to be some inconsistency between the consent order of March 13, 1995, and the agreed statement of facts filed on January 10, 2000, in this first phase of the trial.[6] This Court, however, cannot accept as an accurate recital of the law the MDC’s stipulation that when it conveyed the Luna to LPS, it also passed on whatever rights it had to recover for damages against BGD. If inconsistencies exist between a statement of agreed facts and a document, such as the consent order here, submitted to the Court as evidence, the language of the document controls. Hollywood v. First Parish in Brockton, 192 Mass. 269, 275 (1906). Further, there can be no implied obligations, such as an assignment of rights, in a government contract. Lewis v. Commonwealth, 332 Mass. 4, 6 (1954). When dealing with the government, the transfer of such an assignment of rights cannot be implied; it must be explicitly expressed.
Moreover, the interpretation of an unambiguous written agreement — such as the March 13, 1995 consent order — is a question of law for the Court. Since in the 1995 order there was no specific language indicating any assignment of rights to sue for matters occurring prior to March of 1995, there was no ambiguity as to what was being conveyed. Indeed, Section 10 of the consent order specifically recites that the “Order is to address only the actions of the parties from the time of this Order forward, in order to accomplish the removal of the Luna from the BGD floating drydock . . .” The Court rules, therefore, that “the plaintiffs [in this case LPS] did not have ownership rights in the property [the Luna] prior to the conveyance of title. They had no valid claim in tort for injury to the property [which occurred prior to the vesting of LPS’s ownership rights] on the basis” of the consent order. Larabee, supra, 390 Mass. at 640.
Since there was no valid assignment of rights from the MDC, LPS only acquired protectable rights in the Luna at the end of March 1995. It therefore has no action for any damages that may have occurred between August 13, 1992, and March 28, 1995.
Thus, there being no conveyance or assignment to LPS of any rights to sue for prior damage to the vessel, LPS has no standing to sue in this case. See Larabee, supra, 390 Mass. at 640. Standing is an issue of subject matter jurisdiction. Only persons who themselves have suffered legal harm can compel the courts to litigate their claims. Ginther v. Commissioner of Insurance, 427 Mass. 319, 322 (1998). Alleging injury is not enough; a plaintiff must prove a breach of a duty owed to it. Id. at 323.
“ ‘Courts are not established to enable parties to litigate matters in which they have no interest affecting their liberty, rights or property.’ See Horton v. Attorney General, 269 Mass. 503, 513-14 [1929].” Razin v. Razin, 332 Mass. 754 (1955).
LPS points to the assignment of rights to it from Terra/Mare in April of 1995. By that time, however, Terra/Mare had long since lost any ability to assign any rights to the Luna by the actions — those of the MDC and itself — in the summer of 1992. An assignee gets only what the assignor had at the time of the purported assignment. Matthews Cummings Co. v. Grande, 281 Mass. 546, 550 (1933). Terra/Mare could no more convey or assign a right to sue for damages to the Luna in 1995 than it could transfer title thereto. It had neither then. And, LPS’s “conclusory assertion that [it] must be granted standing because otherwise no one . . . would have standing is without merit.” Ginther, supra, 427 Mass. at 325. “ ‘[A]n unfounded assumption that, if the individual plaintiffs lack standing, no one will have standing to sue, is not a reason to find standing where none exists.’ Tax Equity Alliance for Mass. v. Commissioner of Revenue, 423 Mass. 708, 716 (1996).” Massachusetts Bay Transportation Authority v. Auditor of the Commonwealth, 430 Mass. 783, 793 (2000).
LPS argues, as well, that it must be considered a consignee of the Luna by virtue of its contract with the MDC. This Court doubts LPS’s consignee status. For *457 title to pass from a consignor to a consignee, there must be an instrument and delivery. Nathanson v. Worcester Bank & Trust Co., 73 F.2d 889, 892 (1st Cir. 1934). The MDC/LPS agreement did not consign the Luna to LPS for the purpose of the sale thereof for the benefit of the MDC. Even if it did, the consignment concept has no significance here. “Unless otherwise agreed, title to any property consigned . . . remains with the consignor.” Commonwealth v. Moreton, 48 Mass.App.Ct. 215, 221 (1999). Unlike in the case of Prevor-Mayorsohn Caribbean, Inc. v. Puerto Rico Marine Management, Inc., 620 F.2d 1 (1st Cir. 1980), at least until March 28, 1995, LPS never received and took possession of the Luna, a requirement to achieve the status of a consignee.
This Court rules, for the foregoing reasons, that the plaintiff lacks standing to pursue the claims presented in Counts I, II and III of the second amended complaint.
Count IV is against the MDC and grounded upon G.L.c. 9, Sec. 27C. LPS points to the part of that statute that places a duty upon the MDC to adopt “all prudent and feasible means to eliminate, minimize, or mitigate” any adverse effects upon the Luna as a result of its decisions and conduct.
Again, however, LPS runs into a standing to sue problem. It is the same damages as are sued for in Counts I-III, occurring during the period from August 13, 1992, to the end of March of 1995, that form the basis for the alleged violations supporting Count IV. “Only persons who have themselves suffered legal harm can compel the courts to assume the difficult task of passing upon the validity of the acts of a coordinate branch of government.” Ginther, supra, 427 Mass. at 322. For all of the reasons expressed above, LPS is not the entity that has standing to pursue any claims for breaches of any duties owed by the MDC to the owner of the Luna — if there was any owner — during the time in issue.
Thus, Count IV must be dismissed as well.
Count V is predicated on the assertion that “LPS was an intended beneficiary of’ the May 28, 1992 agreement between the MDC and BGD for work relating to, and removal of, the Luna and the Venus. An examination of the contract reveals, however, a specific provision preventing any third-party beneficiary rights. Article XXVI, p. G-42, in its first sentence, provides that, “No person or corporation, other than the signer of this contract, as contractor, has any interest hereunder.” Such a provision conclusively bars LPS from recovery against the MDC or BGD under a third-party beneficiary theory. See Barnes v. Metropolitan Housing Assistance Program, 425 Mass. 79, 85 (1997); Evans v. Multicon Construction Corporation, 30 Mass.App.Ct. 728, 739 (1991); Volpe Construction Co. v. The First Nat’l Bank of Boston, 30 Mass.App.Ct. 249, 256-57 (1991).
Moreover, there is nothing in the MDC contract with BGD that suggests in any way that the parties thereto, by that agreement, intended to benefit LPS. Spinner, supra, 417 Mass. at 556. It was not until August 23, 1992 that the MDC had any kind of agreement with LPS, and BGD never had one of any kind. And it was not until March of 1995 that the MDC exercised its option to favor LPS with regard to the Luna. The Court cannot read any such intent into the May 28, 1992 contract from things and events that occurred later.
Thus, the MDC/BGD contract of May 28, 1992 cannot be found to provide LPS with third-party beneficiary status and standing to sue in this case. Count V must be dismissed also.

ORDER FOR JUDGMENT

For the several reasons set forth above, the plaintiffs second amended complaint must be dismissed as against both defendants and on all counts.

MASS.R.CIV.P. RULE 54(b) DETERMINATION

In this case, both the MDC and BGD have filed against LPS counterclaims which remain pending and unresolved. Nevertheless, appellate resolution of this Court’s decision dismissing Counts I-V will simplify, shorten or expedite the trial of this case. Dattoli v. Hale Hospital, 400 Mass. 175, 176 (1987). Further, the interests of sound judicial administration so warrant. United States Trust Co. v. Herriott, 10 Mass.App.Ct. 319, 322 (1980). This Court, therefore, determines that there is no just reason to delay the entry of final judgment as to the plaintiffs claims on Counts I-V and consequently directs the same.

This case only involves the Luna. It is assumed, however, that Terra/Mare also became the record owner of the Venus.

A copy of this agreement is attached as Exhibit F to the January 4, 2000 affidavit of Attorney Edmund J. Gorman, filed in support of the motion that provoked bifurcation of this case. Although not offered in evidence at the first phase of the trial, this Court will assume that the document attached to the affidavit is accurate.

This group did not include Gage, Venditti, or anyone else from Terra/Mare.

Although apparently signed on behalf of LPS on July 20, 1992, the agreement clearly recites that it was “entered into this 23rd day of August 1992.”

A prior notice — also ignored — was given to Terra /Mare on August 29, 1991.

Paragraph 22 of the Agreed Statement of Facts reads, in material part, as follows: “MDC stipulates that, to the extent that it ever had or acquired . . . any right to recover for damages to Luna occurring between August 13, 1992 and March 28, 1995, one hundred per cent of any such right, title and/or interest was fully and absolutely conveyed to LPS by the Consent Order dated March 13, 1995, and no form of interest in or associated with the vessel was withheld or retained by the MDC."