COMMONWEALTH vs. FLORENCE DIJOHNSON.

No. 04-P-143.

Middlesex. December 13, 2004. - July 13, 2005.

Present: GREENBERG, LAURENCE, & COHEN, JJ.

*Larceny. Practice, Criminal,* Required finding.

At the trial of a criminal complaint charging the defendant with larceny of property with a value exceeding $250, the judge erred in denying the defendant's motion for a required finding of not guilty, where the ownership of the property in question (an electronic database of information that the defendant had created pertaining to patients of a critical nurse specialist for whom the defendant worked on a part-time basis) was dependent on the defendant's employment status and on the agreed-upon terms of her engagement, and the Commonwealth's evidence was inadequate to permit the conclusion that the defendant was the nurse specialist's employee or that she was hired to create the database for the nurse specialist. [858-861]

COMPLAINT received and sworn to in the Newton Division of the District Court Department on December 12, 2002.

The case was heard by *Dyanne J. Klein,* J.

*Maria A. Blanciforte* for the defendant.

*MaryBeth C. Long,* Assistant District Attorney, for the Commonwealth.

COHEN, J. A falling out between the defendant, Florence DiJohnson, and Marilyn Litman, a medical professional for whom DiJohnson performed part-time billing services, resulted in DiJohnson's criminal prosecution and conviction on the charge of larceny of property with a value exceeding $250. See G. L. c. 266, § 30(1). The property in question was a compilation of billing and patient information that DiJohnson had entered, organized and stored on her laptop computer to track the claims that she submitted on Litman's behalf to health insurers. We agree with DiJohnson that her motion for a required finding of not guilty should have been allowed, and on this basis reverse the judgment.

*Facts.* We summarize the prosecution's case, viewing the evidence in the light most favorable to the Commonwealth. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979). Litman is a critical nurse specialist who works with therapy patients and prescribes medication. In January, 2002, Litman hired Di-Johnson, whom she knew previously, to do the billing for her practice. Although at one point she had an undefined connection to a group practice, at all relevant times, Litman's primary office was in her home.

DiJohnson, who held a full-time job elsewhere, worked for Litman on a part-time basis. Approximately one evening per week, she would go to Litman's house, where she would be given access to information needed to process insurance claims. It was Litman's practice to document the days she saw patients and make other relevant notations on a piece of paper. Di-Johnson would enter the information on her laptop computer,[1] bill the insurers, and keep track of payments that were made and claims that were rejected, using a software program called "Therapist Helper" to facilitate her record-keeping.[2] For these services, Litman paid DiJohnson a flat monthly fee. There was no written agreement between them.

In May or June of 2002, Litman noticed that numerous insurance claims were being rejected for payment. She hired Lana Mitchell to investigate, and Mitchell determined that DiJohnson had neglected to submit some claims and had submitted others with incorrect provider numbers. On September 15, 2002, Litman invited Mitchell, DiJohnson, and Litman's personal accountant to dinner at her home, for the purpose of conducting a visual demonstration of the problem areas related to billing. Di-Johnson became upset, announced that she was quitting, and left the house.

---

[1] Litman stated that she advanced a portion of the money needed by Di-Johnson to purchase the computer. Whether in return for this assistance or otherwise, DiJohnson did not charge Litman for the first few months of services. Regardless, it was undisputed that the computer belonged to Di-Johnson and that Litman made no claim to it.

[2] The Commonwealth did not establish where DiJohnson performed these tasks. During the defense case, DiJohnson testified that she did most of her work at her own home. She also testified that she was the purchaser and license holder of the "Therapist Helper" software that was installed in her computer.

The next day, Litman called DiJohnson and asked her to provide Litman with the computer "database" pertaining to her patients.[3] DiJohnson refused, saying that she had nothing belonging to Litman. When Litman called her again a few days later, DiJohnson again refused, adding that she lacked the means to download the information.

Litman found a computer specialist who was willing to assist with downloading the information, and, on September 20, they went to DiJohnson's house for that purpose. When they arrived, the lights were out in the driveway, and DiJohnson did not answer the phone; however, sitting in the driveway was a carton containing sheets of paper with the names of Litman's patients, their identifying data, and some cursory information about money. The papers were printouts of data concerning all of Litman's patients, but the records were not complete, dates of service were missing, and there were inaccuracies.

Litman proceeded to hire Donna Ball to reconstruct the database. Ball contacted each of the patients' insurance companies to obtain relevant billing history (i.e., dates of service, claims sent out, payments received, rejections, and reasons for rejections) and entered this information into a computer, again using "Therapist Helper" software. This project was time consuming and cost Litman "thousands of dollars."

On October 25, 2002, Litman contacted the police department stating that DiJohnson had left her employment taking all of Litman's billing information with her. When a police officer investigated, DiJohnson stated that anything she had was her own property, and she did not think she had to turn it over to Litman. On December 12, 2002, a criminal complaint issued charging DiJohnson with larceny over $250, a felony carrying a potential sentence in State prison. See G. L. c. 266, § 30(1); G. L. c. 274, § 1.

*Procedural background.* The case was tried before a judge of the District Court, sitting without a jury. From the outset, DiJohnson maintained that she could not be prosecuted for larceny

---

[3]Throughout the trial, the term "database" was used in its conventional sense: "[a] compilation of information arranged in a systematic way and offering a means of finding specific elements it contains, often today by electronic means." Black's Law Dictionary 422 (8th ed. 2004).

because she was an independent contractor hired to perform billing services, and the database that she assembled to assist in the performance of these services was her own property and not that of Litman.

At the close of the Commonwealth's case and again at the close of all the evidence, the judge denied DiJohnson's motions for a required finding of not guilty. The judge found DiJohnson guilty as charged, imposed a sentence of one year of probation, and assessed court fees. In addition, the judge ordered Di-Johnson to provide Litman with a computer disk containing all of the information relating to Litman's patients and, after independent verification that she had done so, to delete the records from her computer. The judge also ordered that there be a hearing on restitution.[4]

*Discussion.* "To support a conviction of larceny under G. L. c. 266, § 30, the Commonwealth is required to prove the 'unlawful taking and carrying away of the personal property of another with the specific intent to deprive the person of the property permanently.' " *Commonwealth* v. *Donovan*, 395 Mass. 20, 25-26 (1985), quoting from *Commonwealth* v. *Johnson*, 379 Mass. 177, 181 (1979).[5] In this case, the Commonwealth identified the property in question as the database of information pertaining to Litman's patients, which resided, in electronic format, on DiJohnson's computer.[6]

We have no difficulty with the general concept that a defendant may be prosecuted for stealing a database. Indeed, the larceny statute specifically defines "property" to include, among other things, electronically processed or stored data. G. L. c. 266, § 30(2). See *Commonwealth* v. *Geane*, 51 Mass. App. Ct. 149, 154-155 (2001). It is fundamental, however, that to serve as a basis for a larceny conviction, the property in

---

[4]The appellate record does not reveal whether the hearing went forward and, if so, whether and to what extent restitution was ordered.

[5]Here, the Commonwealth also was obliged to prove that the value of the property in question exceeded $250. G. L. c. 266, § 30(1). Because DiJohnson does not raise the issue and because we reverse the conviction on other grounds, we do not consider whether the Commonwealth adduced adequate proof on this element of the offense.

[6]The Commonwealth did not contend or introduce any evidence that Di-Johnson had taken (or refused to return) Litman's handwritten notes.

question must be established to be the property of another. See *Commonwealth* v. *Souza*, 397 Mass. 236, 238 (1986); *Commonwealth* v. *Bundza*, 54 Mass. App. Ct. 76, 77 (2002). Here, the evidence was insufficient to establish beyond a reasonable doubt that the database belonged to Litman, as opposed to DiJohnson.

On the record adduced by the Commonwealth, the nature of the parties' business relationship and their understanding as to their respective rights in the database remained a matter of speculation. It was not made to appear that DiJohnson was an employee, rather than an independent contractor[7]; nor was it made to appear that she had been retained to create a computerized record-keeping system for Litman, as opposed to being hired to perform billing services using tools and methods of her choice. These distinctions are significant because if DiJohnson was an independent contractor, hired to perform billing services in whatever way she saw fit, the database was merely the means by which the work for Litman was to be accomplished and not property belonging to Litman.

Guidance on this issue is provided by the case of *Ipswich Mills* v. *Dillon*, 260 Mass. 453, 457-459 (1927), which appears to remain sound law despite its age. See *In re Kave*, 760 F.2d 343, 357-358 (1st Cir. 1985). In *Ipswich Mills, supra* at 454, the plaintiff, a manufacturing company, brought a civil suit against its accountants seeking the return of papers relating to its business. The papers fell into several categories, including some that had originated in the client's office (these papers were conceded to belong to the client and were ordered returned), copies of the client's tax returns (which the accountants were

---

[7]The overriding test of employee status is whether the employer has the right to control the work activities of the employee; however, there are many potentially relevant factors. See Restatement (Second) of Agency § 220(2) (1958). See also *Dias* v. *Brigham Med. Assocs., Inc.*, 438 Mass. 317, 322 & n.7 (2002). See, e.g., *Commonwealth* v. *Savage*, 31 Mass. App. Ct. 714, 717-719 (1991), reversing an employer's conviction for violation of the weekly wage statute, G. L. c. 149, § 148, because the supposed employee made her own hours, worked out of her home, bought her own equipment and office materials, was paid by commission, received no vacation or sick pay, received an Internal Revenue Service Form 1099 from her employer, filed her tax return using Schedule C for business and professional income, and hence, indisputably was an independent contractor.

permitted to retain for their internal purposes), and, relevant here, worksheets used by the accountants to prepare the client's tax returns. *Id.* at 454-455.

The court held that the worksheets belonged to the accountants because the accountants were not the agents or servants of the clients — they were independent contractors engaged in their own occupation — and, furthermore, because the parties had no contractual understanding as to the retention or surrender of the documents. *Id.* at 457-458. The accountants were not employed to make the worksheets; the worksheets were merely the means by which the work for which the accountants were employed might be accomplished. *Ibid.* Thus, in the absence of an agreement that the worksheets were to belong to the client or were to be held for it, they were the property of the accountants. *Ibid.*

The court reached this conclusion even though the worksheets contained confidential information of importance to the client. The interest of the client in the information collected and copied by the defendants as well as its confidential nature was not enough in itself to give title to the client of papers that were made by the accountants for their own assistance in preparing the client's tax returns. *Id.* at 458. Whether the client could enjoin the accountants from publishing any of the disputed papers was a separate matter, unrelated to the question of ownership. *Id.* at 456.

In the present case, the database assembled by DiJohnson is analogous to the accountants' worksheets in *Ipswich Mills* in that it was an organized compilation prepared by DiJohnson to facilitate her billing work.[8] Thus, the ownership of the database was dependent on DiJohnson's employment status (whether she was an employee or independent contractor) and on the agreed-upon terms of her engagement (whether she was hired simply to get the billing done however she chose to do it, or whether she also was hired to assemble, maintain, and provide a computerized record-keeping system for Litman).

Despite the centrality of these questions, the Commonwealth's case hardly touched upon them. Indeed, the record reflects that

---

[8]Here, only this compilation was in dispute. Unlike *Ipswich Mills*, there was no issue as to any raw data supplied by the client. See note 6, *supra*.

throughout the trial, the prosecutor did not consider the resolution of these issues to be important.[9] Because the Commonwealth's evidence was inadequate to permit the conclusion that DiJohnson was an employee or that she was hired to create the database for Litman, DiJohnson's motion for a required finding of not guilty should have been allowed.

On a broader note, we think it unfortunate that the heavy artillery of a criminal prosecution was marshaled in this case. "[W]ith respect to most business disputes, it . . . make[s] little sense to substitute the crude tool of criminal prosecution for the purpose-built conventions that traditionally govern mercantile conduct." *Commonwealth* v. *Oliver*, 60 Mass. App. Ct. 770, 777 (2004) (Brown, J., dissenting), *S.C.*, 443 Mass. 1005 (2005). See *Commonwealth* v. *Moreton*, 48 Mass. App. Ct. 215, 219-220 (1999). Although we appreciate Litman's concern (evidently shared by the trial judge) that after she and DiJohnson came to an unpleasant parting of the ways, DiJohnson remained in possession of confidential data relating to Litman's patients, there were other remedies available to secure the information, short of instigating a criminal prosecution. See *Commonwealth* v. *Santos*, 58 Mass. App. Ct. 701, 709-710 (2003). Indeed, as it turned out, the sentence that the judge fashioned bore a remarkable resemblance to types of relief that would have been available on the civil side of the court.

*Conclusion.* The judgment on the complaint is reversed and the finding set aside. Judgment for the defendant shall enter on the complaint.

*So ordered.*

---

[9]When DiJohnson sought to cross-examine Litman in an effort to show that she was an independent contractor, the prosecutor objected on relevancy grounds, and the judge sustained the objection. In closing, the prosecutor argued, in substance, that DiJohnson's employment status was not germane in a criminal case and that it was self-evident that the database belonged to Litman.